## BRYANT CAWLEY *et al.*

*v.*

## THE PEOPLE, for the use of Woodford County.

*Filed at Ottawa May 18, 1880.*

95  249
145  261
95  249
d182 407
95  249
103a¹¹ 35

1. OFFICIAL BONDS—*effect of failure to file bond in time.* The provision of law requiring a county treasurer to file or renew his official bond on or before the first day of December next after his election is not mandatory, but directory. The neglect to file such bond in the prescribed time is but a ground of forfeiture of office, and is not a forfeiture of itself, and a subsequent approval of his bond filed at a later day is a waiver of a right to declare a vacancy in the office.

2. SAME—*eligibility of a defaulter of public moneys.* The constitutional provision making a defaulter of public moneys ineligible to any office of trust or profit, presupposes that the default shall be ascertained and fixed by judicial or other legal authority. Until this is done the acts of such officer will be valid and binding, and his sureties will be liable for them.

3. SAME—*fraud as to sureties in concealing facts.* A county board whose duty it is to approve the official bond of a county treasurer, is under no obligation to communicate to the sureties on his bond the fact that their principal had made and was in default as treasurer in a preceding term, even if they have knowledge of such fact, where the sureties make no inquiry of the board or any of its members in regard to the fact, and the failure of the board or any member thereof to seek the sureties and give such information, even if it was known, is no fraud on the sureties.

4. SAME—*and herein, of the power of the county board.* If a portion of the members of a county board, or all of them, know of the default of a county treasurer in his preceding term and fail to make it known to the sureties on his bond for the new term before its approval, no inquiry being made of them, such concealment can not bind or affect the interests of the county. It may be, if the board on a settlement had found the principal a defaulter and entered on their record that he was not, that persons thus injured might claim there was fraud, but the court is not prepared to hold that even this would release the sureties of such bond. It is not within the scope of their authority to release such sureties without any consideration therefor.

5. SAME—*withdrawal of bond for new sureties before approval.* The filing of the official bond of a county treasurer with the county clerk is only a conditional delivery, depending on its approval and acceptance by the county board. Until its approval the delivery is not complete, and where a committee of the board, appointed to investigate the sufficiency of the security, are not satisfied and require additional sureties, the withdrawal of the bond and

procuring its execution by several other persons will not release the original sureties, and is not an unauthorized alteration of the bond.

6. SAME—*how far sureties bound by action of their principal in procuring other sureties.* Where sureties on an official bond entrust it to their principal, imposing no restrictions on him, it will be presumed that they intend to invest him with authority to procure a sufficient number of additional sureties to insure its approval, without reference to the time when it shall be done.

7. SAME—*whether a bond has been rejected.* Where a county board neither approved nor disapproved an official bond, but appointed a committee to ascertain and report whether the security was sufficient, and the committee required additional names to the bond, and when this was done reported the security as sufficient, this was held no rejection of the bond by the committee, and it was further held that the committee had no power to approve or reject the same, and that this could be done only by the board as an organized body, and that they could not delegate the power to others.

8. SAME—*report of county treasurer, where he is his own successor—how far binding on sureties.* Where a county treasurer, after his re-election, makes an official report showing a balance of county funds in his hands, the act being within his official duty, his sureties are concluded from showing that the amount so shown was not actually in the treasury at the time the report was made.

9. Where a county treasurer's commission, on his re-election, was dated on the first day of December, and his bond and oath of office were filed on the fiith of that month, and his report presented to the county board more than a month after his new term commenced, of the state of his accounts down to December 3 of the same month, showed a balance of county funds in his hands at that date, it was *held,* that the report was as treasurer of the new term, and, as such, binding on the sureties in his last bond. Where an officer is elected his own successor, the law will transfer any balance in his hands at the end of the preceding term to his second term, and he and his sureties will be concluded from denying that the sum so reported was not in his hands as treasurer of the last term.

10. Where a county treasurer, who is also *ex officio* collector, makes a report of county moneys received by him as collector, the sum so reported will be transferred to his account as treasurer, and he will be credited as collector, after which he and his sureties as treasurer will be liable for the same, and it matters not that such report is approved after he has absconded, where it is approved as made without any alteration.

11. SAME—*officer's books as evidence.* In an action upon the official bond of a county treasurer, his books as such officer, and the entries therein, are proper evidence of the state of the account against him and his sureties, whether the entries were made by him or his book-keeper, the presumption

being that he would not permit improper or incorrect charges to stand uncorrected.

12.  SAME—*rule of construction.*  While the liabilities of sureties are to be strictly construed, it is not the duty of courts to aid them to escape liability by technical and hypercritical construction.  If the law has been substantially complied with in taking and approving official bonds, the sureties will be bound.

13.  COUNTY TREASURER—*liability, how discharged.*  A county treasurer can only discharge himself for county funds in his hands by paying to the county in money, county orders or jury warrants.  He can not pay in promissory notes, checks, drafts or other paper, and if such paper comes into the hands or control of the county after the treasurer defaults and absconds, it will not operate as a credit or set-off except so far as money has been received on them.

APPEAL from the Circuit Court of Woodford county; the Hon. N. M. LAWS, Judge, presiding.

Messrs. CHITTY, CASSELL & GIBSON, for the appellants.

Messrs. SHAW & EDWARDS, and Mr. S. S. PAGE, for the appellee.

Mr. CHIEF JUSTICE WALKER delivered the opinion of the Court:

At the election in November, 1877, Whitaker was elected treasurer of Woodford county.  He thereupon executed and filed the bond in suit in this case.  He had been elected and qualified and served in the office for the two preceding terms, and was consequently his own successor.  Thirteen of his sureties signed the bond before it was filed with the county clerk, and four of them about a month later.  His oath of office bears date the 28th day of November, 1877, but the record discloses no file-mark, so far as we have been able to find.

His bond was dated on the 3d day of December, 1877, and was filed on the 5th day of that month.  And it is assumed in argument that the oath was filed on the same day.  His commission bore date on the 1st day of December, 1877.

The first meeting of the county board, after his election, was on the 8th day of January, 1878. And he on that day filed a report, as required by the statute, extending from the 1st of September, 1877, to the 3d of the following December, the time fixed for the term of his office to begin. On the day after, it was approved by the board.

When the board met, on the 8th of January, 1878, the question of the sufficiency of the security came before it on the motion to approve the bond. The question was referred to a committee to examine and report. They asked further time, and it was extended until the 22d, to which time the board adjourned. When the board again met, the committee reported the security was satisfactory. When the committee came to investigate the ability of the sureties they were unwilling to report recommending the approval of the bond with the names of the thirteen sureties that were then signed to it, but handed it to Whitaker to procure additional names to it, when he procured four additional sureties, whose names were inserted in the body of the bond and signed to it, with seals annexed. The bond was then returned to the committee, and they reported it to the board and it was approved.

These are the material facts as to the execution, delivery and approval of this bond, and on them a portion of the principal legal questions arise. A trial was had, when the jury found a verdict in favor of the people, and after overruling a motion for a new trial, judgment was rendered on the verdict.

The propositions for determination are presented by pleas, the evidence and instructions. But as the same questions are presented in each of these modes it is unnecessary to consider them in detail, and as presented by each of the modes of raising the objections. Nor do we regard it as at all necessary to discuss all of the objections urged. We shall, however, examine such as we regard of sufficient gravity to demand consideration.

It is urged that as Whitaker did not file his oath and bond on the first Monday in December, 1877, his office became vacant, and he was unauthorized to file his bond and oath two days later and enter upon the discharge of the duties of the office, and his bond was void, and the thirteen sureties who first signed the bond never became liable thereon, and there was no right of recovery against them.

We are referred to the 8th section of article 10 of the constitution, which provides that county officers shall enter upon the duties of their respective offices on the first Monday of December following their election, and the treasurer shall hold his office for two years, and until his successor shall be elected and qualified. The 1st and 2d sections of the chapter entitled "County Treasurers," provide for his taking the oath of office and executing bond, which bond shall be filed with the county clerk on or before the first Monday of December after such election. The 125th section of the chapter entitled "Elections," provides that every elective office shall become vacant on the happening of several contingencies, among which is this: "On his refusal or neglect to take his oath of office, or to give or renew his official bond, or to deposit or file such oath or bond within the time prescribed by law."

It is claimed that the language of these provisions is mandatory, and the word "shall" is used in its imperative sense. This question was before us in the case of *Chicago* v. *Gage*, *post*, 593, in an action on the bond of a city treasurer, when this defence was interposed by sureties, as in this case. The charter under which the treasurer was elected and the bond was executed, provided the bond should be deposited with the city clerk within fifteen days after notice of his election, and if not filed within that time "the person so in default should be deemed to have refused said office, and the same should be filled by appointment, as in other cases." The treasurer elect failed to file his bond within the prescribed

time, but did some days afterwards, and entered into the performance of the duties of the office, and became a defaulter.

It was held these provisions in respect to the time within which the official bonds were required to be filed were not mandatory, but merely directory. The municipal authorities had power, in their discretion, to declare a vacancy, or to waive the default as to the mere time of filing bond and to accept and approve it when afterwards filed. The mere default in that regard would not, of itself, operate to vacate the office. It was held to be entirely competent for the city council to waive the default as to the time when it should have been filed, which was but a ground of forfeiture, and not a forfeiture of itself,—and so far as concerned the sureties, the apparent authority with which they had clothed their principal to make use of and deliver it as his official bond by signing and sealing the same and leaving it with him, was a continuing authority until some step should be taken by them towards its revocation; that they were liable on the bond to the same extent as if it had been filed within the time limited by the charter.

That case is conclusive of this question. They are, in this respect, alike in all of their essential features. The charter, in its requirements, was as explicit and positive as the constitution and statutes. It is true, that was under a city charter and related to a city treasurer, whilst this case arises under the constitution and the statutes. But that can not matter, as the same reasons for the construction there given apply with equal force in this case. No well defined or reasonable distinction can be taken, as the same rules of interpretation apply to both cases. This defence can not, therefore, be allowed.

It is claimed that the 4th section of article 4 of the constitution provides that any person who has been a collector or holder of public moneys and shall not have accounted for and paid them over according to law, shall be ineligible to any office of profit or trust, and that as Whitaker was a defaulter, as a

holder of public moneys, he was ineligible to the office, and never constitutionally in office, and his bond was void. This provision presupposes that the default shall be known and fixed. And the default could only be fixed by judicial or other legal authority. It may be that if such a defaulter were to be elected or appointed, and enter into the office, he could be ousted by *quo warranto.* But so long as he holds the office his acts would be valid and binding. If this were not so, all receipts and vouchers given by him as treasurer would be void, after he became defaulter, whether the fact was known or not at the time. The framers of that instrument never, could have intended such results. Until the fact was properly ascertained, he, under his commission and oath of office, held the *indicia* of legal title to his office, and his acts were binding, and his sureties were liable for them until his title might be impeached by appropriate proceedings.

It is claimed that Whitaker was and had been a defaulter, and that the fact was known to the board and concealed from the sureties, and was a fraud upon them, and that fact released them from all liability. There is nothing to show that, upon any of his reports or settlements he was a defaulter, and that is the only means by which the board or its members could have known the fact unless he had communicated it to them. It nowhere appears that they acquired the knowledge averred in either of these modes. But had the fact appeared from his settlements, that would have been as apparent to the sureties as to the members of the board. But a complete answer is, that the sureties made no inquiry of the board, or its members, in regard to whether Whitaker was a defaulter. The board, or any of its members, were not their agents, nor did the law or morals require the members of the board to seek the sureties to give them such information. Nor could the neglect of any member to give the information, even if they had possessed it, have been a fraud by the board. It only acts as a body and not as individuals. The law has conferred power and imposed duties upon the board only as an aggregate body.

Whatever power the board may exercise, is as a body. It surely can not be that a member of the board can bind the county, unless specially authorized, nor can he, by any individual act of his, release persons from their obligations to the county. Nor could he thus perpetrate such a fraud as is claimed in this case, so as to release these sureties from liabilities they assumed by signing this bond. Whatever individual liability they might thus incur, or whatever wrong they might perpetrate, it could not operate to bind the county. It is not within the scope of their authority, nor within the limit of their power. So that even if a portion of the members, or all of them, suspected or even knew that Whitaker was a defaulter, and they failed to seek the sureties and inform them of the fact, we are unable to say that the county could be held bound by such concealment. It may possibly be that had the board, on ᴀ settlement with him, found he was a defaulter, and had entered on their records that he was not, and persons had been injuriously misled by the record, the person thus injured might claim that there was fraud, but we are not prepared to hold that even that would have released these sureties.

It must be borne in mind that there is a broad distinction between individual and official acts performed by the same person. What an individual may do in reference to his own private affairs will bind him unless the act be prohibited by the law or a sound public policy. This is so because he has ample power to perform the act. But an officer, or a body of officers, can lawfully only perform such acts as are imposed or authorized by the law. When they transcend the limit of the power conferred, the act is void. They are limited and controlled in their official acts, and they are not, unless authorized, empowered to do or not to do official acts.

In this class of cases they are empowered, and it is enjoined on the board, to require a sufficient bond from the treasurer and to approve it. They have no power to dispense with the duty, nor can they, without a proper consideration, release

sureties from their obligations under the bond. If they were to do so, in fraud of the rights of the people, the act would have no binding effect and would be void. Much less can they release them, and thus defraud the people, by failing, as individuals and not as a board, to seek or send notice to all persons that the treasurer elect is a defaulter. As was said in the case of *Roper* v. *Sangamon Lodge,* 91 Ill. 518, the board was asked nothing, nor did they say anything to mislead appellants. And if what was there said in reference to a private corporation was correct, it must apply with more force to a body acting for the public. There is no force in this objection.

It is claimed, that when the bond was filed with the county clerk, its delivery was complete, and its withdrawal and the addition of four names in the bond, and their signatures and seals added to the bond, was unauthorized and avoided the bond as to the thirteen original sureties,—that it was a material alteration that rendered the bond void. In this, we are of opinion that there is a misconception of the fact of the delivery. If it was then complete, the board were then bound by the filing as an acceptance, and they would have been powerless to reject it, or to have required other and further security, unless it had changed, after the bond was filed and before it came before them for approval. There was no complete acceptance until the bond was approved by the board. Its deposit with the clerk can only be regarded as a conditional acceptance, depending on its approval and acceptance by the board, and it must be understood that the sureties executed the bond and entrusted it to Whitaker to do all things necessary to its complete delivery. They imposed no restriction upon him as to the number of additional sureties he would procure, nor the time within which they should be obtained. But they no doubt expected and desired that he should procure a sufficient number to render the bond satisfactory to the board, and this they no doubt expected without reference to the time when it should be done.

17—95 ILL.

The sureties knew that the bond would be delivered to the clerk, and they knew it would afterwards come before the board for its action,. and they knew that if the security was deemed insufficient, further security would be required. It nowhere appears that they forbade Whitaker to obtain other names to the bond or notified the board that they had limited his authority in obtaining names to the time when it should be filed with 'the clerk. The presumption is they invested him with authority to procure names to the bond until the security was satisfactory, and until the bond should be approved by the board. See *McCormick* v. *Bay City,* 23 Mich. 457, and authorities therein cited.

In the case of *Chicago* v. *Gage, supra,* after filing the bond with the city clerk, Gage withdrew it and had the blanks filled with the names of the sureties, the penalty and date, etc., and still the bond was held valid and the sureties liable, —that such alteration did not render the bond void. In principle that case is like the present, and we are unable to draw any well founded distinction between the two cases.

It was also held that where sureties sign a bond having blanks, which, to render it complete, must be filled with the names of sureties, the amount of the penalty, dates, etc., and deliver it to the principal obligor, they will be held to thereby confer on him authority to fill the same unless they limit and restrict his authority by filling the blanks themselves, and if the principal fills the blank in an appropriate manner consistent with the nature of the obligation proposed to be given, so the obligee receives it without notice or negligence, and in good faith, the sureties will be estopped from alleging they executed it with a reservation or upon a condition as to the filling of the blanks, whether of the names of sureties, penalty or dates.

It is also urged that the board or its committee rejected the bond, and when that was done it ceased to have any force whatever, and being thus annulled, its vitality could not be again revived and the sureties rendered liable without their

consent, which was never given, but on the contrary the bond was withdrawn after its rejection, the four sureties signed it, and it was returned and approved without their knowledge.

The bond was not rejected by the board, nor by the committee. There was no vote of the board taken on the question whether the bond should be approved until the committee reported the security sufficient, when it was approved. When the question first came up there was a committee of five members of the board appointed to inquire and learn whether the security was sufficient. On investigation, they came to the conclusion that the sureties were worth $120,000 to $130,000, but not worth $150,000, the penalty of the bond, and they thought it best to require additional names, rendering the security equal to the penalty. The bond was, therefore, delivered to Whitaker for the purpose, and he procured the names and returned it to the committee, and they reported it to the board. The committee did no act that can be held to amount to a rejection. Morever, they had none, the slightest, authority to have rejected it. They were only authorized to learn and report facts to the board for its action, and had they attempted, in the most formal manner, to reject or approve it, such action would have been destitute of all validity, as fully so as similar acts by any other five persons. The approval or rejection could only be done by the board as an organized body, nor had they the shadow of power to delegate the authority to others. They, by adopting the recommendation of their committee, made it their own, but the action of the committee had no binding force until it was adopted by the board.

It follows, from what has been said, that the four sureties, who signed after the bond was lodged in the clerk's office, have no right to complain that the bond was void as to the thirteen who were released and they were not informed of the fact. They not having been released, the latter four have only incurred the liability which was intended when they became sureties.

Whilst the liabilities of sureties are to be strictly construed, it is not the duty of courts to aid them to escape liability by technical and hypercritical construction. All laws are intended to be executed and enforced, and it is not the duty of courts to so construe them as to defeat their operation. They have to be executed by the ordinary instrumentalities that are afforded. It is not expected or required that plain business men can, in executing the laws, so act as to avoid the nice objections that can only be seen by highly trained lawyers who have spent a lifetime in sharpening their perceptions in taking nice distinctions. All we have a right to require of such agencies is, that they shall carry out the law in its spirit, and shall substantially comply with its requirements. To adopt a rule that none but the ablest men in the profession could comply with, would be to end the administration of the government and the enforcement of the law.

It is next insisted that the court erred in permitting the report of the treasurer to be read in evidence, and in refusing to permit appellants to show the money was not in the treasurer's hands during the time he acted as treasurer under the bond they had signed. In the case of *Chicago* v. *Gage*, *supra*, it was held, that where the law requires a city treasurer to make and keep an account, and make statements thereof at specified times, under oath, as to receipts and disbursements, and balances on hand, these acts being within his official duties, for the performance of which the conditions of his official bond provide, in an action on the bond the sureties are concluded from showing that the amount so appearing as treasury balances in the hands of their principal was not actually in the treasury at the time. This is conclusive of this question, and no distinction exists between that and this case, on this question.

But it is urged that the report was not made as treasurer for the term for which he was last elected, but as treasurer of his previous term; that it was made as ex-treasurer, and.

not as the then acting treasurer. The report was presented
to the board more than a month after his term commenced.

It is true that it only embraced the period from the 1st of
September, 1877, till the 3d day of December—the day his
official term commenced, and the day his bond bears date;
and his term undeniably commenced on the 3d of the month.
His commission bears date on the 1st, and he had taken his
oath of office before the 3d, which was the 1st Monday of the
month. His commission and his qualification by taking the
oath clearly invested him with a full legal title to the office,
although he was required to file his oath and bond before he
was legally authorized to exercise or perform its functions;
but he was manifestly in office under this bond, and in the
full exercise of all of its duties and rights when he presented
this report to the board, and he charged himself with a bal-
ance in his hands at the commencement of his term, and this
report was made by him as treasurer for that term, and was
an official act of that term.

In the case of *Chicago* v. *Gage, supra,* it was held that
where a city treasurer is elected his own successor, as respects
balances in his hands at the close of his first term, if he
entered them in his treasury books as actually coming from
his predecessor and continued from time to time to return
and report them as in his hands, both he and his sureties
would be concluded, in an action on his bond for the second
term, from denying that these balances actually came to his
hands as treasurer. It was his duty to receive all balances
from his predecessor, and the law will transfer such balances
on hand to his second term. So, in this case he reported the
balance in his hands at the end of his second term, and the
law will operate to transfer it to his third term. And he and
his sureties for the third term are by that report concluded
from denying that it was in his hands as treasurer of that
term. There was, therefore, no error in the admission of this
evidence and ruling that it could not be contradicted. This
is also sustained by the case of *Morley* v. *Town of Metamora,*

78 Ill. 394, and *Roper* v. *Sangamon Lodge, supra,* where the same rule is announced.

It is claimed that the court erred in the admission of Whitaker's report of July 10, 1878, which was filed on that day in the office of the county clerk. It is insisted that the money reported was received by him as collector and not as treasurer, and he and his sureties are liable on his collector's bond for the amount of that sum which remains unpaid. The complete answer to this is that by the provisions of sections 190 and 191 of the Revenue Law, when he made this report to the county clerk, all that he reported as having received as county collector was transferred to his account as treasurer, and he was credited by the amount as collector. There was, therefore, no error in this.

But, it is said that the report was approved after he absconded and he was not present. We are at a loss to see in what possible manner that could make the slightest difference. He made, signed and swore to the report, and it was approved as made, without any alteration. He was allowed all he claimed. The report was made as treasurer, and he charges and credits himself as treasurer.

There would seem to be no kind of doubt that his books were proper evidence of the state of his accounts. We are unable to imagine what would be better evidence against him and his sureties. The entries in the books were made by him, or by his book-keeper under his direction or supervision. No one can believe that he would permit improper charges to stand against him uncorrected on his books; nor that he did not examine them to see they were correct. And we are aware of no other means by which he could be as fairly charged as by his own books if honestly kept, and he surely would not claim they were unfairly kept against himself. Had appellee only introduced all charges against him, without out reference to his books, it would have operated hardly on appellants to prove disbursements to discharge him. But

when his books were introduced they were relieved of the burthen.

There can be no question that the treasurer could only discharge himself for county funds in his hands by paying to the county, in money, county orders or jury warrants. The statute requires him to pay in such funds. It is not intended that he may pay in promissory notes, checks, drafts or other paper. The county might, by agreement, receive such paper as collateral security, for the benefit of the county and his sureties, or as a means of receiving payment, but not as payment; and if, after Whitaker absconded, any such paper came into the hands of the county, or under its control, that did not operate as a credit or set-off, except so far as money had been received on them. There was no error in so instructing the jury.

We are clearly of opinion that the evidence sustains the findings, and that the court below committed no error to the prejudice of appellants. A very large number of instructions were asked, and in so large a number as were given it is almost singular that some fatal error was not committed. But, the whole record considered, we are of opinion that there is no error of which appellants have a right to complain, and the judgment of the court below is affirmed.

*Judgment affirmed.*