THE STATE ex rel. JOHN P. ·BELL v. UNITED STATES FIDELITY AND GUARANTY COMPANY, Appellant.

**Division One, July 6, 1911.**

1. **PROPER PLAINTIFF: Treasurer of State Hospital: Suit on Bond.** The proper plaintiff, in a suit on the bond of a defaulting treasurer of a State hospital, is not the State at the relation of his successor in office, but the State at the relation of the State Treasurer, to whom the treasurer of the hospital was required by statute to pay the money forthwith upon its collection by him, and if he neglected to do that he at once became a defaulter and could at once have been sued for defalcation.

2. ————: ————: ————: **Waiver.** The bringing of a suit in the name of the wrong party is an error apparent on the face of the petition, and should be raised by demurrer, and if not so raised, defendant will be held to have waived it. So that, although the suit against the surety on the bond of a defaulting treasurer of a State hospital should have been brought in the name of the State at the relation of the State Treasurer, and not in the name of the State at the relation of the treasurer of the State hospital who succeeded the defaulter in office, defendant will not be heard to contend that the suit was brought in the name of the wrong party, if no demurrer setting up such error was filed. The State was the real party in interest, and so far as it is concerned it is immaterial who was made relator.

3. **OFFICIAL BOND: Treasurer of State Hospital: Defense: Failure of Board to Discover Treasurer's Former Defalcations.** The sureties of a public officer are not discharged by the laches or fraud of other public officers. The fact that the board of managers were required by law to examine the books, receipts and disbursements of the treasurer of the State hospital, and made such examination, and approved and spread of record a report finding no defalcation, when by careful diligence they could have ascertained that he had for some years been continuously appropriating to his own use the moneys of the institution, and that defendant relied upon the truth of that report in becoming surety for said defaulter, is no defense when suit is brought upon the treasurer's bond. And neither is it a defense that the auditing committee appointed by the Governor found no error in said treasurer's accounts, and that defendant surety, in reliance upon the truth and accuracy of said examination, became his surety.

State ex rel. v. Fidelity and Guaranty Co.

4. ——: **Amount Due: Finding of Referee: Special Verdict.** The findings of the referee, in a suit on the official bond of a public officer, that a certain sum is due, are on appeal given the standing of a special verdict, and if supported by substantial evidence they will not be disturbed.

5. ——: ——: **Used to Pay Debts of Hospital.** If the treasurer of the State hospital used moneys received by him to pay debts of the institution, instead of sending them to the State Treasury, to be drawn out on requisitions drawn by the board of managers, it was a technical breach of the bond, but as the State received the benefit thereof his surety should not be required to reimburse the State for the amount. But in this case it is shown that he used only $10 in that way, but appropriated to his own use $15,172.70 during the time covered by his bond.

6. ——: ——: **Pleading: Proof.** It is sufficient, in the State's suit upon the bond of a defaulting official, to allege that he has defaulted in a named amount, without itemizing the sums embezzled; and such general charge is sustained by proof that he received a certain sum and paid out a certain less amount, regardless of the items.

7. ——: ——: **Money Deposited in Bank.** The duty of a treasurer of a hospital, when he received money from the State Treasurer, upon a warrant drawn by a board of managers, did not end when he deposited that money in a bank; it still belonged to the State, and his surety is liable for so much of it as he checked out and appropriated. Likewise his duty did not end with the collection of money from the counties and depositing it in the bank, instead of sending it to the State Treasurer, as the law requires. He had no right whatever to deposit the moneys in the bank, or to use it for any purpose whatever, and whatever he used in that way his surety is liable for.

Appeal from Jackson Circuit Court.—*Hon. James E. Goodrich*, Judge.

AFFIRMED.

*Ball & Ryland* for appellant.

(1) The State cannot maintain an action on this bond at the relation and to the use of John P. Bell as treasurer of State Hospital Number 1. Connor v.

Zackry, 117 S. W. 177; State v. Moody, 202 Mo. 120. (2) The bond has no retroactive application. The defendant in no case could be answerable for any misconduct of Thomas, except such as occurred after the execution and delivery of the bond, to-wit, May 9, 1903. Todd v. County, 8 Mo. 431; State v. Jones, 89 Mo. 470; State ex rel. v. Finn, 98 Mo. 537. (3) The burden in such case is on the plaintiff to show with definiteness the defalcation, if any, of Thomas during the period when defendant's bond was in force. Draffen v. Boonville, 8 Mo. 395; State v. Atherton, 40 Mo. 209; Pundmann v. Schoenich, 144 Mo. 149. (4) It was error to strike out pars. 2 and 3 of the answer. The law is the same when the state is a party as it is in case of individuals, except that the Statute of Limitations in law suits and the doctrine of laches in equity cases do not apply. (5) If Thomas used any of the moneys sued for to pay warrants instead of sending those moneys to the State Treasurer and having the State Treasurer send them back to him to pay the warrants, it was merely a technical breach, *damnum absque injuria.* State v. Atherton, 40 Mo. 209. The State does not charge in its petition that prior to the collection of the items sued for Thomas had embezzled other moneys and had used the collections in question to make good such prior defalcations. No such issue is presented by the petition. (6) The undisputed evidence shows that none of the collections made subsequent to Jan. 1, 1905, and up to Feb. 16, 1905, were used by Thomas, excepting in making remittances to the State Treasurer; and that subsequent to Feb. 16, 1905, he never collected or disbursed in any way or for any purpose any moneys of the institution, or drew any checks for any purpose on his account as treasurer, kept in the Calloway Bank. (7) The evidence shows without dispute that when he left he gave no authority to anybody to do anything except he told his bookkeeper, Miss Howe, to make the February remittance

to the State Treasurer. (8) There is no showing whatever that if Thomas used any money between Jan. 1, 1905, and Feb. 16, 1905, to pay warrants, what they were or how much they were. There is no proof whatever as to how much money he had on hand in the bank at the time he left. There is no proof whatever that he left any authority with Miss Howe or anybody else to draw any checks on his account in payment of outstanding warrants. There is no proof whatever as to what warrants or the amount of them were paid after he left. If the bookkeeper or the officers of the institution or the bank in any way misapplied any moneys which Thomas had on hand at the date of his absconding or which were thereafter received, this defendant is not responsible for it.

*Elliott W. Major,* Attorney-General, and *W. M. Williams* for respondent.

(1) The error assigned that the treasurer of State Hospital No. 1 is not the proper relator is not well taken. a. It is made the duty by statute of the treasurer of State Hospital No. 1 to sue for and collect "all debts and demands whatsoever due the asylum, and all damages for failure of contract and for trespass and other wrongs to the asylum, or any property thereof, real or personal." R. S. 1899, secs. 4853-4852. b. It is only the treasurer, i. e., the person holding the office, who is required to make official reports to the State Auditor and transmit the money of the hospital to the State Treasurer. Where money belonging to the hospital is in the hands of any other person, it must be paid to the treasurer of the hospital and by him remitted to the State Treasurer. R. S. 1899, secs. 7883-7884-7885. c. The objection in any event comes too late. There was no demurrer to the petition, and any objection to a defect of parties.

or to want of capacity to maintain the suit was waived. State v. Sappington, 68 Mo. 454; State v. Bonner, 5 Mo. App. 13; Bank v. Gilpin, 105 Mo. 17; Spillane v. Railroad, 111 Mo. 555. (2) Where a bond is given for the faithful performance of the duties of an agent or employee of an individual or private corporation who, at the time, is a defaulter, it is no defense to the surety in the bond that the fact of the previous embezzlement could have been discovered by the obligee in the bond by reasonable care and diligence. The surety in private contracts is only discharged where the person for whose benefit the bond is given had knowledge of the wrongdoing and fraudulently concealed it. Bank v. Owen, 101 Mo. 583; Tapley v. Martin, 116 Mass. 275. (3) The surety upon an official bond is not released on account of the negligent failure of other officers of the State to discover previous defalcations of the principal; nor is such surety discharged because the auditing or accounting officers representing the State had actual knowledge of the wrong-doing and failed to disclose it. A different rule prevails in regard to official bonds from that applicable to private contracts. Throop on Public Officers, sec. 286; Meecham on Public Officers, sec. 389; Hogue v. State, 62 N. E. 656; Hallettsville v. Long, 32 S. W. 567; Wade v. Mt. Sterling, 33 S. W. 1113; Palmer v. Woods, 39 N. W. 668; F. & D. Co. v. Commonwealth, 47 S. W. 579; Detroit v. Weber, 26 Mich. 284. (4) The reports of the legislative committees were made for the benefit of the General Assembly and the record of the board of managers for the benefit of the State and the hospital. They cannot be treated as representations or statements made to the defendant and upon which it had the right to rely in the execution of the bond sued upon. Utley v. Hill, 155 Mo. 271. (5) While it might properly be contended that the bond sued on, although not executed until the 9th day of May, 1903, shows by its

recitals that it was intended to cover the entire term for which Thomas was elected and authorities might be cited in support of that position, still the referee only held the defendant for the defalcations expressly shown to have occurred subsequent to the execution of the bond. Therefore, whether or not the bond is retroactive is immaterial upon this record. (6) "Findings of fact by a referee in a law cause are in the nature of a special verdict, and an appellate court will not weigh the evidence on which they are based if such evidence is of a substantial nature." McGregor v. Construction Co., 188 Mo. 621; Vogt v. Butler, 105 Mo. 479; Bissell v. Ward, 129 Mo. 439.

WOODSON, J.—This is a suit on the official bond of W. D. Thomas, treasurer of State Hospital No. 1, located at Fulton, Missouri. A trial was had which resulted in a judgment for the State, and the defendant duly appealed the cause to this court.

Thomas was elected treasurer of that institution on March 10, 1903, for a term of two years and qualified as such on May 9th, the same year, by executing the bond in suit with defendant as surety. Between February 14th and 16th, 1905, he absconded from Fulton, ostensibly for a visit to Washington City, leaving his clerk in charge of the office. He has never returned and has never been heard of but once since his departure.

The relator John P. Bell was duly elected treasurer of that institution on March 14, 1905, to succeed said Thomas, and duly qualified and gave bond on April 11th, of that year. Thereupon, this suit, in the name of the State, at the relation of Bell, as such treasurer, was brought against the appellant, as such surety in the said bond of Thomas, for his alleged default in failing to account for and pay over money collected by him for said hospital during the term for which said bond was given. Thomas had been

treasurer of that institution some two or three terms, just prior to the one covered by the bond in suit.

In brief the petition charged, as a breach of the bond, that Thomas, in violation of his duties as treasurer, received for said institution, during said term, the sum of $14,429.28, which he failed to report to the State Auditor, or to pay to the State Treasurer, as required by statute, but converted the same to his own use. The prayer of the petition was for $30,000, the penalty of the bond, with execution for the sum sued for, with six per cent interest per annum. The items sued for are not set out in the body of the petition, but it refers to "Exhibit A" attached thereto and made a part thereof, which does show those items, aggregating some forty odd in number, amounting to $21,813.80.

The answer admitted the execution of the bond, and then denied each and every other allegation contained therein.

And for further defense the answer in paragraphs two and three set up that Thomas had served as treasurer of said institution for three terms prior to the term for which he was appointed, beginning March 10, 1903; that during said preceding terms he had made his regular monthly reports to the board and that monthly during those six years the board entered of record a certification to the effect that his accounts as treasurer had been audited and examined and found in all respects correct; that such certification and records of the board were entirely false; that if any examination had been made of the treasurer's books and accounts, or auditing had of the same, at any time after two months from the date of his first election as treasurer, it would have been manifest by the most cursory and inexpert examination that he had continually, during nearly the whole of the said period of six years, misappropriated and embezzled the funds of the institution; that the defendant knew

of and relied upon the said official records of the board of managers as to the conduct of the office by Thomas during said preceding terms, and that but for the same it would not have executed the bond sued on.

In the third paragraph the answer sets up the publication by a legislative committee, appointed pursuant to law by the Governor, to examine into the conduct and accounts of the officers of the various State institutions, including the books and accounts of Thomas, and that said committee reported that it had made such examination and found the accounts of the treasurer in all respects correct, which said report was officially made and published some time prior to the execution for the bond sued on and its execution and delivery; that the defendant relied upon the truth and accuracy of said report, but that as to the said Thomas the same was false and untrue; that but for such report and the defendant's reliance thereon it would not have executed said bond.

The second and third paragraphs of said answer were on motion of the plaintiff stricken out, as not containing any matter constituting a defense to the action. Defendant at the same time excepted to the ruling of the court, and at the same term presented and had allowed and filed its term bill of exceptions to said action.

After the action of the court in striking out the second and third paragraphs of the answer the cause was referred to the court to A. L. Cooper, Esquire, as referee, to hear the cause and report to the court his conclusions of law and findings of fact. After hearing the cause said referee made and filed his report at the January term, 1910, and on February 17, 1910. In the conclusion of the report he found for the plaintiff and against the defendant in the sum of $15,172.70 with interest from the date of the collection of the several items enumerated in said report in Paragraph IV thereof. In due time defendant filed

its exceptions to the report of the referee. At the April term, 1910, the cause came on to be heard by the court on the report of the referee and the evidence and exceptions of the defendant, and at said term, on September 20, 1910, the court overruled the exceptions and each of them, defendant duly saving its exceptions to the action of the court, and the court thereupon confirmed and approved said report and entered judgment against the defendant in favor of the plaintiff in the penal sum of $30,000, and ordered that execution issue for the sum of $17,635.08, being the sum of $14,429.28, with six per cent interest from the date of the filing of the amended petition.

From that judgment, as before stated, appellant appealed to this court.

Assignment of errors in this court:

1.  The referee erred in his conclusions of law in not recommending, and the court erred in not rendering under the pleadings and evidence and report, judgment for the defendant.

2.  The court erred in sustaining the motion of the plaintiff to strike out paragraphs two and three of defendant's answer.

3.  The referee erred in admitting evidence in regard to collections and disbursements made prior to the date of the execution of the bond, to-wit, May 9, 1903.

4.  Under the pleadings and issues referred to him the referee erred in admitting evidence in regard to collections and disbursements made after February 16, 1905, the date when Thomas absconded.

5.  The referee erred in admitting evidence as to collections and disbursements made after March 10, 1905, the date of the expiration of the bond.

6.  The referee erred in his report and in each paragraph thereof, except Paragraphs I, II, and III, in that he entirely ignored the issues made by the pleadings and referred to him.

7.   The court erred in overruling the defendant's exceptions to the report of the referee and in overruling each of them.

8.   The court erred in approving and confirming the report of the referee and in rendering judgment thereon against the defendant.

9.   The court erred in overruling the defendant's motion for a new trial.

10.   The court erred in overruling defendant's motion in arrest of judgment.

I.   Counsel for appellant first insist that the State cannot maintain this action on the bond in question, at the relation and to the use of John P. Bell, the successor of Thomas, as treasurer of said hospital.

This insistance is vigorously controverted by counsel for respondent, and they base the respondent's right to maintain this action on sections 4852 and 4853, Revised Statutes 1899.

The latter section makes it the duty of the treasurer of State Hospital No. 1 to sue for and collect "all debts and demands whatsoever due the asylum, and all damages for failure of contracts and trespass and other wrongs to the asylum or any property thereof, real or personal."

Counsel for respondent insist that the language of that statute is sufficiently broad to authorize the succeeding treasurer, Bell, to institute and maintain this suit, but no authority is cited in support thereof.

Upon the contrary, counsel for appellant contend that the language of that statute limits the duty of the treasurer of the hospital to sue for all demands it has against the various counties, for the care, maintenance and treatment of indigent persons, or against individuals for the support of private patients; also for all damages for failure of contract, trespass or other wrongs done to the asylum or any of its property.   In support of that contention we are cited to the

cases of Connor v. Zackry, 117 S. W. 177 (Texas); State v. Moody, 202 Mo. 120.

In the former case Zackry was the duly elected and acting treasurer of Morris county, and as such he sued Willis, his predecessor in office, and the securities on his bond for defalcations in his account of the county school funds. The bond there was by law made payable to the county judge and not to the successor of Willis or to the county. That court in quoting from the case of Jernigan v. Finley, 90 Tex. 205, said: "Its treasurer is custodian of so much of the available school fund as may be set apart to the county. The county superintendent, if there be one, and, if not, the county judge, superintends its distribution under the law. . . . We have already endeavored to show that, to the money for which the warrant in controversy is sought, Travis county, in its corporate capacity, is not entitled, either in its own right or as trustees for the public schools of the county." Continuing on page 181 the court said: "It seems to us that if the county is neither the owner of the fund, nor a trustee for its distribution, and the treasurer of the county is to be regarded as to that fund an officer of the State, then the county would have no more authority to maintain an action for its recovery when misappropriated by the treasurer than would any other stranger."

In the latter case the State of Missouri sued Moody, clerk of the county court of Macon county, for a balance collected by him on hunter's license. The defendant, among others, interposed the defense that the suit was improperly brought, in the name of the State, and insisted that it should have been brought in the name of the State Game Warden. In answer to that contention the court, speaking through Judge Burgess, said: "But under the Act of March 10, 1905, 'creating the office of Game and Fish Warden,' all moneys collected by way of license fees and by

way of fines for violations of the law are required to be paid into the State Treasury and become part of the revenue of the State. The fact that the money so collected is for the use of the game protection fund does not prevent the State from controlling it, and the State is the proper party to sue therefor. "In the case of State v. Rubey, 77 Mo. 610, the right of the State to maintain an action for her own funds, after default made in paying same into the State Treasury, is clearly recognized. The same is announced in Wolffe v. State, 79 Ala. 201; Gaston v. State, 88 Ala. 459; Esley v. People of Illinois, 23 Kan. 510; Delafield v. State of Illinois, 2 Hill, 159; State v. Delesdenier, 7 Tex. 76; State v. Thompson, 64 Tex. 690; State v. Travis County, 85 Tex. 435; State v. Burkeholder, 30 W. Va. 593. In the case of Brown v. State, 5 Colo. 496, it is said: 'It is the accepted law that a State, as a political corporation, may maintain, in its corporate name and in its own courts, actions for the enforcement of its right or the redress of its wrongs, independently of any statutory provision therefor. The right springs from the general principle that every person, whether natural or artificial, capable of making a contract or suffering wrong, may have an action to enforce the one and to redress the other.' "

It seems to us that the cases cited are in point and control this question. Especially is that true when read in the light of sections 7803, 7804 and 7805, Revised Statutes 1899, which make it the duty of Thomas and all other treasurers of the asylum to collect all moneys due the institution from counties for the support and treatment of indigent persons therein, and from individuals who place therein private patients, and further upon the receipt thereof to immediately notify the State Auditor of the sums so received, and to pay the same forthwith into the State Treasury.

Under those sections of the statute, when Thomas received the money in question, and neglected to pay it into the State Treasury forthwith, he, at that time, became a defaulter, and he then could have been sued for such defalcation, just as well as his surety was sued therefor after his abscondence. That being unquestionably true, if the insistence of counsel for respondent is correct, then the State at the relation of Thomas as treasurer of Hospital No. 1 should have sued Thomas, as treasurer of the same institution. But if upon the other hand the contention for counsel for appellant is correct, then the suit should have been brought in the name of the State Treasurer, the official to whom the money was due and payable by the sections of the statute before cited.

As previously stated, these views are supported by the cases before quoted from and are based upon both reason and common sense.

No person or official should be required to sue himself, which Thomas would have been require to have done if respondent's insistence is correct; but if appellant is correct in that regard, then the suit should have been brought by the official to whom the money was due and payable; namely, the State Treasurer and not by the treasurer of the asylum, who had no right whatever to the custody of the money or the right to disburse the same.

The rights of these parties to sue was not and could not be changed in the least by Thomas's abscondence, nor by the appointment of his successor in office. Suppose Thomas had never been removed from office, or that his successor had never been appointed, could it be logically contended that he could not have been sued either by the State in its own name, as was done in the Moody case, supra, or by the State at the relation of State Treasurer, the official to whom the money was payable? We think not. We are therefore of the opinion that the suit was erroneously

brought in the name of Mr. Bell, relator; and that it should have been brought in the name of the State Treasurer, for the reasons previously stated.

But counsel for defendant, however, insist that even though it be conceded that the suit was brought in the name of the wrong party, nevertheless, appellant is in no position to question that error here, for the reason that the error, if error it was, appeared on the face of the petition and respondent not having raised the same by demurrer, the error was waived by pleading over. This contention of counsel seems to be based on solid grounds. The State was the real party in interest, and in so far as it is concerned it is wholly immaterial whether the suit was begun in the name of the State Treasurer or in that of the treasurer of the asylum; in either event the money received will ultimately find its way into the coffers of the State.

That was the view taken by this court of a similar question in the case of State to the use of Saline County v. Sappington, 68 Mo. 454. There the State brought the suit for the use of the county, upon the bond of Sappington, former treasurer of that county, for misappropriation of school funds, The funds there did not belong to the county, and the objection was made there, as here, that the suit was not brought by the proper relator. In answer to that objection this court on page 457, said: "But if we concede that Saline county was not the proper relator, still this concession does not aid the defendants, and for this reason: If defendants were desirous of testing the question, they should have stood on their demurrer, since the alleged defect was patent on the face of the petition, and could not be taken advantage of by demurrer, and not by answer. [2 Wag. Stat., par. 6, 10, pp. 10, 14, 15.] When, therefore, the demurrer was overruled and defendants answered, they waived and abandoned whatever vantage ground they may have ac-

quired by demurring (Ware v. Johnson, 55 Mo. 500);
and could not raise the same question anew in their
answer, in respect to a defect of parties. These con-
siderations induce the affirmance of the judgment.''

The same result was reached by the St. Louis
Court of Appeals, in the case of State to the use of
St. Louis County v. Bonner, 5 Mo. App. 13.

And in Mechanics' Bank to use of Davis v. Gil-
pin, 105 Mo. 17, this court said: ''The only ground
urged in this court for a reversal of the judgment is
that the Mechanics' Bank is not the real party in in-
terest. It is claimed by appellant, and conceded by
respondent, that the action ought to have been
brought in the name of Oliver B. Filley's administra-
tors.'' In discussing that objection, this court, on
page 22 said: ''We think appellant waived this de-
fect by not demurring, when he could have demurred.
It was not a defect affecting the merits of the case
in the least degree, and it can be cured by amend-
ment in this court. This course is especially provid-
ed for by sections 2113 and 2114, Revised Statutes
1889, and such amendments as this have often been
made by this court under them. [Mueller v. Kaess-
mann, 84 Mo. 318; Cruchon v. Brown, 57 Mo. 38; Weil
v. Simmons, 66 Mo. 617; McClanahan v. West, 100
Mo. 309; Hunt v. Railroad, 89 Mo. 607.] The appel-
lant in his argument to this court says: 'If the ac-
tion had been brought by the right party, the defend-
ant would have insisted upon his defense that defend-
ant was not liable on the draft, which was the basis
of the judgment sued upon in the case at bar, and that
the return of the sheriff is false and fraudulent. We
should have appealed to the court to destroy the pre-
cedent set by the case of Hallowell v. Page, 24 Mo.
590, and bring the law into conformity with the pro-
gressive spirit which has in other states swept away
the doctrine as inconsistent with justice and right.'
Such a practice as this cannot be tolerated for a mo-

ment.  The point upon which a reversal is asked is so dry and technical that we can almost hear it rattle as we write it down.  The error would have been corrected in the court below, if it had been merely suggested.''

We are therefore of the opinion that appellant waived this question by not demurring, and by pleading over.

II.  It is next contended that the circuit court erred in striking out paragraphs two and three of the answer.

The second stated that Thomas had been treasurer of said institution for three terms just prior to the execution of the bond sued on; that he was a defaulter during those terms, and that this wrong-doing could have been discovered by a reasonable investigation of his books and accounts pertaining to his office, but notwithstanding that, the board of managers of the institution accepted his reports and certified upon its records that his accounts had been examined and found to be correct; and the third paragraph stated that legislative investigating committees had repeatedly reported to the Governor and Legislature that his accounts had been examined and approved by them; that the defendant had knowledge of those records and reports and relying upon their truthfulness, was induced thereby to execute the bond sued on.

This contention is destitute of all merit.  Those records were, by law, required to be kept, and reports to be made for the information and use of the State and her officers, and not for the use of the appellant. If it relied upon those records and reports, that was its misfortune, and not the fault of the State.  The rule insisted upon by counsel for appellant, in that regard, has no application to official bonds.  It seems to be practically universally held that the sureties of

an officer are not discharged by the laches or fraud of other officers of the State.

Mr. Throop, in his excellent work on Public Officers, in section 286, states the rule in that regard as follows: *"Certain facts not defenses in action upon disbursing officer's bond.*—The principle, that the government, or its representative, the obligee, is not responsible for the negligence or other misconduct of other officers, is well illustrated in the ruling that the sureties in a tax collector's bond cannot defeat a recovery upon the bond, by proof that the collector was a defaulter when he was appointed, and that the appointing officers knew that fact but did not disclose it; and this, although the statute expressly forbids such an appointment; or the appointing board falsely represented that the accounts for the preceeding term had been settled. So the failure of the proper officers to remove a delinquent financial officer, pursuant to the directions of the statute, is not a defense to an action against the sureties for a subsequent defalcation. Where the county commissioners erroneously advertised that a tax collector had paid up all his liabilities for a preceeding term of office; and the defendants became his sureties for a new term, in reliance upon the advertisement; it was held that they were nevertheless liable." Numerous cases are cited by the author in support of the text.

The Supreme Court of Indiana held in the case of Hogue v. State, 62 N. E. 656, when the defense interposed was the same as here, with the additional allegation of fraudulent concealment by the officer whose duty it was to take the bond, was insufficient to discharge the surety. In discussing that question the court said: "Appellants rely upon the case of Wilson v. Town of Monticello, 85 Ind. 10, as sustaining the proposition that fraud by the officers prevents recovery on the bond. In that case the principal in

the bond sued upon was not a public officer, but an agent employed to refund municipal indebtedness. The bond was not given in pursuance to the requirements of any statute, but as a part of a business transaction. Bundy v. Town of Monticello, 84 Ind. 119, 132. It was held that fraud on the part of the town officers, whereby the sureties were induced to execute the bond, invalidated it as to them. Treating the instrument as a private, and not as an official bond, given in a business transaction, and not in pursuance of a statute, the decision was correct. The language used and the authorities cited show that it was so treated. The distinction between acts done by a public officer and acts done by an individual, whereby one is induced to become surety, was not considered by the court. The opinion shows that, it was not in the mind of the court, and therefore was not decided. There is such a distinction. The government is not responsible for the laches or wrongful acts of its officers. [Minturn v. U. S., 106 U. S. 437; Hart v. U. S., 95 U. S. 316; Osborne v. U. S., 19 Wall. 577; U. S. v. Pine River Logging & Improvement Co., 61 U. S. App. 69, 89, 89 Fed. 907.] The defense that other officers were guilty of laches in allowing Hogue to qualify for his second term is not available to the sureties. Statutory directions are given for the security and convenience of the public, and form no part of the contract between it and the sureties on an official bond. The validity of the bond does not depend upon the performance of statutory duty by other officers. [Stern v. People, 102 Ill. 540; Palmer v. Woods, 75 Iowa, 402; Fidelity & Deposit Co. of Maryland v. Com. 47 S. W. (Ky). 579; Frownfelter v. State, 66 Md. 80; Board v. Sheehan, 43 N. W. (Minn.), 690, 5 L. R. A. 785; Board v. Otis, 62 N. Y. 88; Pine Co. v. Willard, 39 Minn. 125, 12 Am. St. 622; School Dist. v. Hubbard, 81 N. W. (Iowa), 241, 80 Am. St. 271; State v. Hays, 42 S. W. (Tenn.), 266.] It follows that the de-

murrer to this paragraph of answer was correctly sustained.''

The same rule has been announced in the following cases: City of Halletsville v. Long, 32 S. W. (Texas) 567; Wade v. Mt. Sterling, 33 S. W. (Ky.) 1113; Fidelity & Deposit Co. v. Commonwealth, 47 S. W. (Ky.) 579; Palmer v. Woods, 39 N. W. (Iowa) 668; City of Detroit v. Weber, 26 Mich. 286.

III.   The bond sued on was dated and executed May 9, 1903; and counsel for appellant contend that it was not retrospective in its operation; and that in no case could appellant be charged with any misconduct of Thomas prior to that date.

There is quite a learned discussion of that question in the brief of counsel, but upon an inspection of the report of the referee, and the judgment of the court, we find that the appellant was not charged with any sum collected or misappropriated by Thomas prior to that date.   The referee expressly so states in his report, which was approved by the court.

That being true, it becomes unnecessary for us to decide that question, and for that reason we decline to do so.

IV.   This brings us to the consideration of the question: first, was Thomas a defaulter during the term of office covered by the bond sued on? and, second, if so, what was the amount of his defalcation?

As to the first proposition stated, respondent charges and appellant in oral argument admitted that Thomas was a defaulter during that term of office, but they differ widely as to the amount of his defalcation.

Without pressing this proposition further, we will go directly to the second, which is the vital question presented by the record for determination.

The referee found that the amount of money Thomas collected after the execution of bond in suit,

and which he did not report to the State Auditor or pay into the State Treasury, was $21,287.45. There was found, however, in the bank, to the credit of Thomas, as treasurer, at the close of his last term, the sum of $6,214.75, which was turned over to his successor, for which the referee gave Thomas credit, which left $15,172.70, the amount of his defalcation. However, the prayer of the petition was for only $14,-429.70.

The findings of the referee after stating the issues were as follows:

"I find that on March 10, 1903, W. D. Thomas was duly appointed treasurer of State Hospital Number 1, located at Fulton, Missouri, for a term of two years. He qualified as such treasurer and executed the bond sued on with the defendant as surety thereon on May 9, 1903. It is urged by the defendant that the bond is not retroactive but became effective from its date only. I find that this contention is correct and that the bond became and was effective from and after the date of its execution and did not relate back to the date of the appointment of Thomas as treasurer on March 10, 1903.

"4. Subsequent to the execution of said bond, the said W. D. Thomas as such treasurer, collected the amounts, from the sources and upon the dates following, to-wit:

| DATE. | SOURCE. | AMOUNT. |
| --- | --- | --- |
| February 9, 1905 | Audrain county | $ 2,660.50 |
| February 16, 1905 | Benton county | 137.65 |
| February 13, 1905 | Crawford county | 831.15 |
| February 14, 1905 | Callaway county | 1,820.10 |
| February 10, 1905 | Cape Girardeau county. | 226.50 |
| January 9, 1905 | Franklin county | 2,347.60 |
| October 13, 1904 | Jefferson county | 2,105.15 |
| September 8, 1904 | Jefferson county | 838.25 |
| February 1, 1905 | Jackson county | 5,104.95 |
| February 10, 1905 | Knox county | 256.15 |
| October 10, 1904 | Lafayette county | 980.20 |
| February 10, 1905 | Madison county | 187.95 |

State ex rel. v. Fidelity and Guaranty Co.

| | | |
|---|---|---:|
| March 4, 1905 ................. | Maries county ........ | 409.90 |
| October 10, 1904 ............... | Macon county .......... | 614.40 |
| September 14, 1903 ........... | Osage county .......... | 65.00 |
| October 6, 1904 ............... | Ralls county .......... | 884.90 |
| September 18, 1903 .......... | Scotland county ........ | 65.00 |
| October 17, 1904 .............. | Saline county ......... | 873.90 |
| June 12, 1903................... | Schuyler county ...... | 65.00 |
| September 11, 1903 ........... | Schuyler county ...... | 65.00 |
| November 13, 1903 ............. | St. Charles county .... | 65.00 |
| March 9, 1905 ............... | Howard county ........ | 130.00 |
| March 4, 1905 ............... | Monroe county ........ | 65.00 |
| March 11, 1905................. | Warren county ........ | 65.00 |
| February 16, 1905.............. | Dent county .......... | 283.15 |
| February 23, 1905 ............. | W. S. Boyd, guardian.. | 32.50 |
| April 7, 1904 ................. | C. P. Cloyd, guardian .. | 32.50 |
| July 1, 1904 .................. | T. E. Cullen .......... | 32.50 |
| March 9, 1905 ............... | F. A. Daniel .......... | 32.50 |
| March 15, 1905 ............... | Mrs. J. W. Gregg ..... | 7.50 |
| January 26, 1905 ............... | Mark Pilcher .......... | 32.50 |
| March 15, 1905 ............... | S. H. Steinbliss ........ | 32.50 |
| March 17, 1905 ............... | W. H. Tinsley ........ | 37.55 |

Total ......... .....$21,387.45

"5. On or about February 16, 1905, the said W. D. Thomas left Fulton, Missouri, and has never been heard from since. Subsequently John P. Bell was duly appointed treasurer of the State Hospital and there was turned over to him as such treasurer, a balance in a bank at Fulton, Missouri, to the credit of said Thomas, as treasurer, amounting to $6,214.75, and the defendant is entitled to a credit for this amount. I find that the said Thomas having collected the items set forth in the preceding paragraph hereof (paragraph numbered 4), unlawfully embezzled, appropriated and converted the same to his own use, and has not at any time accounted for the same. None of said moneys were reported by Thomas to the State Auditor and none of the same were paid or remitted by him to the State Treasurer, but on the contrary, he retained all of the same and unlawfully converted and appropriated the same to his own use, save and except only the said balance to his credit in the bank, to-wit, $6,214.75, above mentioned.

"6. Certain of the items mentioned in paragraph 4 of this report (as will appear from the dates) were collected subsequent to the expiration of the term of office of said Thomas and subsequent to the time that he absconded, but prior to the appointment of Mr. John P. Bell as treasurer of the hospital to succeed Thomas, but such amounts were collected by a clerk appointed by Thomas who aided and assisted him in the conduct of the office and had authority from him to accept money and receipt for same in his name, and the items referred to were deposited by her in the bank to the credit of Thomas and were not remitted to the State Treasurer or reported to the State Auditor, all of same being embraced and included in the balance of $6,214.75, mentioned in paragraph 5 hereof. Under these circumstances, I find that such items are embraced in the scope and protection of the bond executed by the defendant and are proper elements to be considered in this suit.

"7. I find against the defendant on the defenses pleaded in paragraphs two and three of the answer. There was no sufficient proof in support of such defenses, even if, in any event, they would amount to any defense to the action. There was no evidence that either the board of managers of the hospital or the legislative committee at any time had any knowledge of the defalcations of Thomas, nor were they in possession of any facts to put them upon inquiry as to such defalcations. I am advised, also, that such paragraphs were stricken out by the court, upon motion, and that the issues raised thereby are not before me for determination.

"8. I find that the said W. D. Thomas made a breach of the said bond (a) by failing to report the items collected by him set forth in paragraph numbered 4 hereof to the State Auditor and by failing to remit the same to the State Treasurer, and (b) by unlawfully embezzling, converting and appropriating the same to his own use.

"9.   It was urged by the defendant that under no circumstances should interest be charged upon the moneys converted and appropriated by Thomas, but in that view and contention I do not concur, and find that interest should be charged upon each of the said items from the date they were severally collected as set forth in paragraph 4, to the date of judgment herein, at the rate of six per cent per annum.

"10.   It will be observed that the aggregate of the items set forth in paragraph 4, less the amount in the bank turned over to Mr. Bell, as hereinbefore stated, leaves a balance of $15,172.70, whereas the petition prays for a judgment of only $14,429.28.   There is also a discrepancy in amount between the prayer of the petition and the items set forth in 'Exhibit A,' attached to the amended petition, but the items set forth in 'Exhibit A' attached to the petition correspond to the findings of this report, where justified by the facts.   It is my conclusion, under these circumstances, to report the facts proven and established at the hearing, and leave to the court, where I think it properly belongs, the matter of conforming the pleadings to the facts, if the court shall deem it proper so to do.   Also as to the matter of interest upon the various items set forth in paragraph 4, such interest will have to be calculated up to the date when judgment is rendered upon this report, and for that reason, I am not reporting the amount of such interest at this time.

"I therefore find and report that judgment should be rendered herein in favor of the plaintiff and against the defendant for the penalty of the said bond, to-wit, $30,000, to be satisfied upon the payment of $15,172.70, plus the interest upon the various items set forth in paragraph 4 hereof from the dates when they were severally collected up to the date of judgment, and for costs of suit.   This is upon the assumption that the petition will be amended to conform to the facts; oth-

erwise, the amount should be reduced to correspond with the prayer of the petition.''

Those findings of the referee stand before this court in the nature of a special verdict, and if they are supported by substantial evidence, this court will not disturb the same. [McGregor v. Construction Co., 188 Mo. l. c. 621.] In the discussion of that question, this court there said: ''The findings of fact by a referee in a case at law stands upon the same footing, in an appellate court, as the verdict of a jury. It is not the practice of this court to review a finding of fact by a referee or a jury in an action at law. This court looks to the facts, in such a case, only far enough to ascertain whether there is any substantial testimony to support the finding, and where such is the case it does not interfere with a finding of fact. [Handlan v. McManus, 100 Mo. 124; Vogt v. Butler, 105 Mo. 479; Bissell v. Warde, 129 Mo. 439; State ex rel. Friedman v. Purcell, 131 Mo. 312; James v. Ins. Co., 148 Mo. l. c. 15-16.]''

Under that view of the law, it becomes the duty of this court to investigate the record, and ascertain whether or not the finding of the referee is supported by substantial evidence. If so, the judgment should be affirmed; if not, then the judgment should be reverse and the cause remanded for another trial.

Preliminary, however, to that, it might throw some light upon the question to briefly notice the law prescribing the duties of the treasurer of such institutions.

Section 7804 made it the duty of the treasurer of said institution to receive from the counties and individuals the money due for the support and maintenance of all patients therein, as well as all other money owning to the same from all other sources, and to forthwith enter the same ''on the books kept by such treasurer, so as to show the source from whence derived, and from whom and on what account it was re-

ceived,'' and to forthwith transmit the same to the State Treasurer, to be held for the use of said hospital.

And by section 7805 he was further required, on or before the 5th day of each month, to prepare a verified statement showing the several sums received during the preceding month, from whom and on what account, and the date of the transmission of each sum to the State Treasurer, and to file the same, together with a certificate of the superintendent, with the State Auditor.

It is thus seen that it was the duty of the treasurer to remit all collections at once to the State Treasurer, and he had no legal right to use such money for any other purpose.

In addition to the items before mentioned and collected by Thomas, but not reported to the State Auditor, or paid into the State Treasury, the evidence shows that during his last term of office Thomas collected and reported to the State Auditor the sum of $252,037.17, which includes, however, the sums made in his reports for the months of February and March, 1905, amounting to $2797.15; and during the same time he paid to the State Treasury $252,037.17. All of these items were properly reported and accounted for by him.

Having thus seen what money Thomas collected from the counties and various persons for the support and maintenance of public and private patients, as well as from all other sources, and reported by him to the State Treasurer; also the amount collected by him, but not so reported or paid into the State Treasury during his last term, it becomes necessary to ascertain what became of that money after he paid it to the State Treasurer. Much light will also be shed upon that question by briefly referring to the law applicable thereto.

The statute provides, that after the board of man-

agers of any hospital has audited and allowed the accounts for the preceding month, and has issued warrants for the same, said board shall draw a requisition in favor of the treasurer of the hospital upon the State Treasurer for the sum sufficient to pay the warrants so drawn by the board. The law also made it the duty of the State Treasurer to remit the amount of money necessary for that purpose to the treasurer of such hospital.

In compliance with the latter statute, the board of managers of said hospital, during Thomas's last term, audited and allowed accounts against said institution for a sum aggregating $341,046.66, and drew requisitions upon the State Treasurer for the same amount. All of those requisitions were duly honored by the latter, and paid to Thomas, as treasurer of the asylum. The record also shows that during that same term, Thomas paid out to the various persons on the warrants aforesaid drawn by the board of managers, a sum aggregating $341,056.66, which was ten dollars more than he received from the State Treasurer on the requisitions drawn by the board of managers.

From this summary of Thomas's financial transactions with the counties and various persons who placed patients in the institution, the deposits he made with the State Treasurer, and the sum he received back from the latter, on the requisition of the board of managers, it clearly appears that Thomas has never accounted to the State for the $15,173.70, heretofore pointed out as having been collected by him and converted to his own use, except, however, the $10 excess he paid on warrants drawn by the board of managers, over and above the sum he received from the State Treasurer upon the requisitions of said board, which if deducted from the defalcation, would leave a clear balance of $15,163.70 unaccounted for, and converted by Thomas to his own use.

If we clearly understand the position of coun-

sel for appellant, the facts as above stated are not seriously controverted, but they seek to reduce the amount of the judgment, for several reasons, to be presently noticed.

(a). That Thomas paid several thousand dollars to various persons on warrants drawn by the board of managers out of said $15,162.70 (claimed as aforesaid by the State to be a defalcation), instead of remitting the same to the State Treasurer, as the statute required.

Upon that insistence counsel for appellant predicate their conclusion, that "if Thomas used any of the moneys sued for to pay warrants instead of sending those moneys to the State Treasurer and having the State Treasurer send them back to him to pay the warrants, it was merely a technical breach, *damnum absque injuria*."

If this contention of counsel was predicated upon the facts of the case, as disclosed by the record, then unquestionably their conclusion would be sound; but, unfortunately for the appellant, that contention is only true in a very small degree.

The record shows in that regard, as before stated, that during his last term of office, Thomas received from the State Treasurer, on requisitions drawn by the board of managers, the sum of $341,046.66, and paid out on warrants issued by the board the sum of $341,056.66, or $10 in excess of the money received by him from the State Treasurer upon the requisitions as aforesaid. From this it appears that Thomas, instead of paying several thousand dollars on warrants drawn by the board, out of said $15,172.70, only paid the sum of $10.

While Thomas had no legal right to pay that $10, in the way he did; nevertheless, the State received the benefit of it, which fact reduces his act to a technical breach of the bond in that respect.

But as to the remainder of said $15,172.70 no

such showing is made, and it stands against Thomas unaccounted for.

(b). Counsel for appellant also insist that the State is not entitled to secure the whole of said $15,172.70, less $10 mentioned, for the reason that "the State does not charge in its petition that prior to the collection of the items sued for, Thomas had embezzled other moneys and had used the collections in question to make good such prior defalcations. No such issue is presented by the petition."

This insistence seems to be borne out by the record, yet we are unable to see in what possible manner the appellant was injured thereby, for the reason that it would clearly have been sufficient for the State to have alleged, as it did in the body of the petition, that Thomas had defaulted in the sum of $14,429.28 ($15,-167.70, the true amount), without itemizing the sums embezzled, as was done in the exhibit attached to the petition.

Such general charge, followed up by the proof of the sum total collected and the sum total paid out, would have shown the amount of the defalcation, and would have made out the State's case, regardless of the items. It unnecessarily pleaded, or rather attempted to plead too much, but as previously stated, that fact did not and could not have worked prejudicially against the rights of appellant. However, the evidence in our opinion was sufficient to prove the correctness of the items stated in the exhibit it attached to the petition.

We therefore rule against the appellant in that regard.

(c). It is next contended that the judgment is excessive because the evidence shows that none of the collections made subsequent to January 1, 1905, and up to February 16, 1905, were used by Thomas excepting in making remittances to the State Treasurer; and that subsequent to February 16, 1905, he never col-

lected or disbursed in any way or for any purpose any moneys of the institution, or drew any check for any purpose on his account as treasurer kept in the Callaway Bank.'' (That is the bank through which Thomas transacted all of the asylum business.)

If we correctly understand the effect of this contention, it is briefly this: that all collections made subsequent to January 1, 1905, and prior to February 16, 1905, Thomas had anything to do with, were remitted to the State Treasurer, and that subsequent to the latter date he had nothing whatever to do with the collection or distribution of the funds due or paid out by the institution.

We are not clear that we understand this contention of counsel, but the inference we draw therefrom is, that the hospital received the benefit of at least some of the money mentioned in the exhibit attached to the petition, because it was used to pay warrants drawn by the board of managers after Thomas left the State.

In reply to that, it seems that Thomas did all of the hospital business through the Callaway Bank, and that he had some arrangement with it, by which he deposited therein all moneys, from every source, collected by him for the institution; that he remitted all moneys to the State Treasurer through that bank; that he deposited therein all moneys received by him from the State Treasurer, on requisitions of the board of managers; and that the bank paid warrants drawn by the board of managers on Thomas as treasurer, and took up and held the warrants so paid as vouchers for such payments, instead of having Thomas give checks therefor.

Of course that arrangement was unlawful, and Thomas had no right to use the money of the institution for any such purpose. His duty was to send all moneys collected for the institution to the State Treasurer forthwith.

If, however, under that arrangement, the bank paid warrants drawn by the board of managers, for which other money had been received by Thomas, out of the funds of the institution collected by him from other sources and deposited in said bank, then neither he nor his surety are in a position to complain of that application of payment.

If Thomas was credited for the payment of warrants, out of money remitted to him for that purpose by the State Treasurer, then neither he nor his surety can complain of the action of the court in charging him with the *unreported* collections, previously mentioned.

He should not be permitted to apply those unreported collections to the payment of warrants and receive credit therefor on that account, and then say that such application of payment was illegal, and then be permitted to further say that the default, in realty, was in the money received by him from the State Treasurer, for the purpose of paying said warrant.

In other words, Thomas should not be twice reimbursed for the one disbursement, or payment of warrants which would be the case, if not compelled to refund the $15,167.70 collected by him, but not reported or accounted for.

His position in that regard is like the "seven-foot man," who tried to cover himself with a "six-foot blanket." When he pulled the blanket up to cover his head it left his feet exposed, and when he pulled it down over his feet it left his head and neck exposed. So it is with the appellant in this case. When it takes credit for warrants paid out of the money collected by Thomas, but not reported, his deficit with the State Treasurer is exposed, and when it takes credit for the payment of those warrants out of the money received by Thomas from the State Treasurer, then the amount of his unreported collections is increased and exposed to the same amount. So it is

thus seen that the one credit asked will no more cover the two debits mentioned, than will the ''six-foot blanket'' cover the ''seven-foot man.''

It is therefore immaterial which horn of the dilemma counsel for appellant takes, it is equally untenable, in so far as the result of this suit is concerned.

The trouble that counsel for appellant are laboring under, it seems to us, is the mistaken theory, that when Thomas collected and deposited the money of the hospital in the Callaway Bank, his duties to the institution had terminated. That is far from the truth. His duty was to collect the moneys of the hospital, and forthwith forward them to the State Treasurer, and he had no right whatever to deposit them in the bank, or to use them for any purposes whatsoever; and when he did so, he did it at his own risk, and not at the risk of the State. That being unquestionably true, then whatever money was paid out by the bank in warrants, or for other purposes under the arrangement previously mentioned, between Thomas and the bank, at his own request or that of his agent, did not concern the State.

So, viewing this case from any standpoint you may, the judgment was for the right party, and should be affirmed. It is so ordered. All concur.