## STATE v. LLEWELLYN ET AL.

### SYLLABUS BY THE COURT.

1. Sections 20, 21, c. 138, Laws 1889 (sections 3571, 3572, C. L. 1897) construed. Held, that such sections require the secretary treasurer of the board of regents of the New Mexico College of Agriculture and Mechanic Arts to execute a bond to the state of New Mexico in not less than the penal sum of $20,000 before entering upon the discharge of his duties as such.          P. 54

2. Where one section of an act of the legislative assembly requires the secretary treasurer of a named institution to execute to the state a bond before entering upon the discharge of his duties, and another section, in providing officers for another named institution, provides that the officers thereof shall be the same and shall possess the same qualifications as the officers named in the prior section, the secretary treasurer of the latter institution is not "qualified" to enter upon the discharge of his duties until he has executed the bond required by the former section.          P. 54

3. The state is not bound by the declarations of its agents, unless it appears that the agent was acting strictly within the scope of his authority; hence the state is not bound by the declarations made by the board of regents of the New

Mexico College of Agriculture and Mechanic Arts to a proposed surety upon the bond of its secretary treasurer that his accounts were in good shape, and that he had the money on hand as shown by his report, where there is no statute of the state authoriing the board of regents to make any representations in that regard.                    P. 58

4.   The proceeds of the sale of lands granted to the state of New Mexico by the Enabling Act, for certain specified purposes, and the natural products of such lands, with certain named exceptions, were intended by Congress to constitute permanent funds, the interest only being available for current use.                                                    P. 61

5.   The rentals derived from such lands may be used for the support and maintenance of such institutions.        P. 61

6.   Statutes will be construed in the most beneficial way which their language will permit to prevent absurdity, hardship, or injustice, to favor public convenience, and to oppose all prejudice to public interests.                            P. 61

7.   The general terms of a statute are subject to implied exceptions founded on the rules of public policy and the maxims of natural justice, so as to avoid absurd and unjust consequences.                                              P. 61

8.   Sureties upon the bond of the secretary treasurer of the New Mexico College of Agriculture and Mechanic Arts are liable for moneys received by such official under color of his office, and hence are liable for moneys in the hands of such official which were derived from the sale of lands granted the territory of New Mexico, although the Enabling Act made some other official the custodian of such funds.        P. 71

9.   Evidence that the assets of the depository bank, holding funds in the hands of an officer of the state were depleted on a named date is insufficient to defeat recovery upon

the bond of such officer for loss of such funds, where such surety does not undertake to show that such depleted assets were not restored prior to the loss of such funds; the bank having continued as a going concern for more than. ten months after the bond was given.                    P. 75

Appeal fom District Court, Santa Fé County; Mechem, Judge.

Action by State of New Mexico against Morgan O. Llewellyn and the Southwestern Surety Insurance Company. Judgment for plaintiff, and defendants appeal. Affirmed.

Francis C. Wilson, of Santa Fe, and S. P. Weisiger, of El Paso, Texas, for appellants.

Bond of defendant was not required by law and consequently was without consideration and· void.

C. 101, Code 1915; Sec. 5091, 5092, 4151, Code 1915. 2 Lewis-Sutherland Stat. Const. Sec. 491; Board of County Commissioners v. Harvey et al. 52 Pac. 402; State v. Heisey, 9 N. W. 327; State v. Bartlett, 30 Miss. 624; Faust v. Murphy, 71 Mass. 120, 30 So. 862; Tuskaloosa v. Lacy, 3 Ala. 618; Hoey v. Pine, 143 Ia. 243, 121 N. W. 1019.

The following cases are distinguished on ground·that bondwas not required but given voluntarily:

U. S. v. Tingey, 5 Pet. 115, 8 L. Ed. 66; Tyler v. Hand, 7 How. 573; Hoboken v. Harrison, 39 N. J. Law, 73.

Where the principle is in office for a definite period, the surety is only responsible for his faithful performance of his duty during that period, and if the bond is silent as to the length of the term, but a statute fixes the

term, the statute in that regard will be considered as the period of the contract of the surety.

Welch v. Seymour, 28 Conn. 387; May v. Horn, 2 Harr. 190; United States v. West, 8 App. D. C. 59; Ida County Savings Bank v. Seidensticker, 128 Iowa, 54, 102 N. W. 821, 111 Am. St. Rep. 189; Chelmsford Co. vs. Demarest, 7 Gray, 1; North St. Louis Building & Loan Assn. vs. Fidelity & Deposit Co. of Maryland, 169 Mo. 507, 69 S. W. 1044; Moss v. State, 10 Mo. 338, 47 A. D. 116; Dover v. Twombly, 42 N. H. 59; Mayor v. Crowell, 40 N. J. L. 207; Blades v. Dewey, 136 N. C. 176, 48 S. E. 627, 103 Am. St. Rep. 924; iFrst National Bank v. Brigg's Assignees, 69 Vt. 12, 37 Atl. 231, 37 L. R. A. 845, 60 Am. St. Rep. 922; United States v. Nicoll. 12 Wheat. 505, 6 L. Ed. 709; Bryan v. U. S., 1 Black (U. S.) 140, 17 L. Ed. 135; Pepole v. Toomey, 122 Ill. 308, 13 N. E. 52; Ulster County Bank v. Ostrander, 163 N. Y. 430, 57 N. E. 627; 103 Am. St. Rep. 933; Westervelt v. Mohenstecker, 76 Fed. 118, 34 L. R. A. 477; N. St. Louis Buidling & Loan, etc., Co. vs. Fidelity. etc., Co., 169 Mo. 507, 69 S. W. 1044.

Presumption is that bond was not intended to cover losses occurring prior to its execution.

Tartentune Realty Co. v. McClure, 230 Pa. 266, 79 Atl. 551.

We admit, however, that burden is on surety to show loss occurred prior to execution of bond.

MacMullin v. Winfield, etc., Assn., 91 A. S. R. 236.

The great weight of authority is to the effect that the surety on the bond of a re-elected official is not estopped by his principal's statements or reports, of what he has on hand at the time of his re-electlon, from showing that such reports or statements are incorrect and that the default occurred during the prior term.

Salazar v. Territory 8 N. M. 1, 41 Pac. 531; Van Sickel v. Buffalo County, 13 Neb. 103, 42 Am. Rep. 753;

Ohning v. Evansville, 66 Ind. 59, overruling State ex rel
Vincennis v. Grammes, 29 Ind. 530; Gordwine v. State,
81 Ind. 109; Bissill v. Saxtotn, 66 N. Y. 55; Kellum
v. Clark, 97 N. Y. 390; Vivian v. Otis, 24 Wis. 518, 1
Am. Rep. 199; United States v. Irving, 1 How. 250, 11
L. Ed. 120; United States v. Boyd, 5 How. 29, 12 L.
Ed. '6; United States v. Stone, 106 U. S. 525, 27 L.
Ed. 163, 1 Sup. Ct. Rep. 287; United States v. Hons-
man, 17 C. C. A. 283, 44 U. S. App. 171, 70 Fed. 581;
Townsend v. Everett, 4 Ala. 607; State v. Newton, 33
Ark. 276; Mann v. Yasoo City, 31 Miss. 574; State ex
rel. Rutledge v. Holman, 93 Mo.; App. 611, 67 S. W.
747; State ex rel Scott v. Greer, 101 Mo. App. 669, 74
S. W. 881; Com. v. Reitzel, 9 Watts & S. 109; Anderson
County v. Hays, 99 Tenn. 542, 42 S. W. 266.

Fraudulent representations to surety will release it
from official bond.

36 Cyc. 880; Sooy v. State, 38 N. J. L. 324, 39 N. J.
L. 135; Wilson et al. v. Town of Monticello, 65 Ind. 10;
Capital Fire Insurance Co. v. Wilson, 76 Minn. 387, 77
A. S. R. 657; Traders' Ins. Co. v. Herber, 67 Minn. 106;
Story on Equity Jurisprudence (11th Ed.) Secs. 206,
215 and 216.

It is the law that when the bond does not specifically
state for what defaults the surety shall be liable, it will
be presumed that the surety contracted with reference
to the duties of the office as they existed at the time
his undertaking was entered into, and the law relating
thereto becomes a part of such undertaking.

Ramsey v. People, 197 Ill. 572, 90 Am. St. Rep. 177;
Davis v. State, 44 Ind. 38.

The general rule is that a change of the duties of
the principal not within the purview of the suretyship
contract discharges the surety.

Victor Sewing Mach. Co. v. Scheffler, 61 Cal. 530; Grocers' Bank v. Kingman, 16 Gray, 473; Boston Hat Manufactory v. Messinger, 2 Pick. 223; Fidelity Mut. L. Assoc. v. Dewey, 83 Minn. 389, 86 N. W. 423, 54 L. R. A. 945; Singer Mfg. Co. v. Hibbs, 21 Mo. App. 574; Tradesmen's Nat. Bank vs. National Surety Co., 169 N. Y. 563, 62 N. E. 670, (affirming 66 N. Y. Suppl. 1146); Manufacturers' Bank v. Dickerson, 41 N. J. L. 448; Tradesmen's Nat. Bank vs. National Surety Co., 54 App. Div. 631, 66 N. Y. Supp. 1146, affirmed 169 N .Y. 563, 62 N. E. 670; Kellogg v. Scott, 58 N. J. Eq. 344, 44 Atl. 190, affirmed 62 N. J. Eq. 811, 48 Atl. 1117.

Surety is not liable for moneys not included, expressly or impliedly, in terms of contract.

Humboldt Sav. Etc., Co. v. Wennerhold, 22 Pac. 920; Smith v. Stephen, 53 Ga. 300; Minch v. Littlefield, 16 Ill. App. 612; Armston v. State, 73 Ind. 175; Nolley v. County Court, 11 Mo. 447; Atterstein v. Alpaugh, 9 Neb. 237; Sutherland v. Carr, 85 N. Y. 105; Common-

wealth v. Toms, 45 Pa. St. 408.

Harry S. Bowman, Assistant Attorney General, for the State.

Statutes impliedly require giving bond by Secretary-Treasurer of N. M. Agricultural College.

Secs. 5121, 5122, 5131, Code 1915; Hyde v. State, 52 Miss. 665; People v. Palen, 74 Hun. 289; Bowman Bank & Trust Co. v. First National Bank, 18 N. M. 589, 139 Pac. 148.

Bond was good as a common law obligation.

U. S. v. Tingley, 5 Pet. 127; U. S. v. Linn, 15 Pet. 311; U. S. v. Hodson, 10 (Wall.) 406; Jessup v. U. S. 106, U. S. 150; Moses v. U. S. 166, U. S. 585.

State v. Llewellyn et al., 23 N. M., 43.

Surety having entered into bond is estopped to deny its validity.

U. S. v. Hudson, 10 Wall. 409; Coons v. People, 76 Ill. 383; U. S. F. G. Co. v. Rainey, 113 S. W. 397; U. S'. v. Maurice, 26 Fed. Cas. 1211, No. 15747; People v. Newberry, 152 Mich., 292; 116 N. W. 419.

No defense against State that officers made fraudulent representations to surety at time of issuing bond.

Frost on the Law of Guaranty Insurance. Secs. 163 and 165, p. 450; Bromberg v. Fidelity & Sep. Co. of Maryland, (Ala.) 36 So., 622; Fidelity & Dep Co. .of Maryland v. Fleming, (N. C.), 43 S. E., 899; State v. U. S. Fidelity & Guaranty Co., (Mo.), 139 S'. W., 163; Aetna Indemnity Co. v. City of Haverhill, 142 Fed. 124; Fidelity & Dep. Co. of Maryland v. Commonwealth, (Ky.), 47 S. W. 579; Independent Shcool District v. Hubbard, 110 La., 58, 81 N. W. 241, 80 Am. St. Rep., 271; Commissioners v. Sheehan, (Minn.), 5 L. R. A., 785; State of Florida v. Rushing, 17 Fla. 226; County of Pine v. Willard, 39 Minn., 125; 1 L. R. A., 118; Crown v. The Commonwealth, 84 Va., 282; State v. Bates, 36 Vt., 387; State v. Dunn, 11 La. Ann., 549; Cawley v. People, 95 Ill., 255; U. S. Fidelity and Guaranty Co. v. State of Kansas, 81 Kas. 660, 106 Pac. 1040, 26 L. R. A. (N. S.) 865.

### APPELLANT'S REPLY BRIEF.

Under common law obligation theory advanced by state surety cannot be held' liable, because money was lost by failure of depositary bank deposited with authority of Regents.

Wilson et al v. The People, (Col.) 34 Pac. 944.

Story on Bailments. Paragraph 620 followed in Wilson v. The People, *supra;* Van Trees v. Territory, 54 Pac. 501 (Okla.) ; City of Livingston v. Woods (Montana) 49 Pac. 437; State v. Gramm, (Wyo.) 52 Pac.

533; Roberts v. Board of Comm. (Wyo.) 53 Pac. 915, 29 Cyc. 1437; Gartley et al v. People (Colo.) 64 Pac. 208; York County v. Watsoal (S. C.) 40 Am. Rep. 675; State v. Copeland (Tenn.) 54 Am. St. Rep. 840.

## OPINION OF THE COURT.

ROBERTS, J.  This action was instituted in the court below by the state against Morgan O. Llewellyn and Southwestern Surety Insurance Company upon an alleged bond given by Llewellyn as secretary-treasurer of the New Mexico College of Agriculture and Mechanic Arts in the penal sum of $75,000. The complaint set up the execution of the bond by Llewellyn, with the surety company as surety, and alleged a default in the condition of the bond and prayed for judgment in the full amount of the bond. A copy of the bond was attached to the complaint as an exhibit. To this complaint the defendant surety company answered, admitting the execution of the bond and set up certain defenses.

To this answer a demurrer was filed and sustained, whereupon an amended answer was filed. The amended answer set up as the first defense that the bond sued upon was invalid for two reasons. First, that the said pretended bond purports to be an official bond, alleged to have been given by the said Morgan O. Llewellyn as secretary-treasurer of said college, and that there was no statute or law of the state of New Mexico which required the execution of any such bond; and, second, that said pretended bond was involuntarily given by the said Llewellyn, in that he was required by the board of regents of the New Mexico College of Agriculture and Mechanic arts, as a condition precedent to his entering upon his duties as such secretary-treasurer, without warrant or authority of law, to enter into a good and sufficient bond to the state of New Mexico in the sum of $75,000, and that in order to enter into the duties of said office and to acquire the same, was required and compelled to enter into the pretended bond.

The second defense set up the prior cancellation of the bond; but as no point is made as to the propriety of

the action of the court in sustaining the demurrer to this paragraph of the answer, nothing more need be said relative thereto.

For a third defense the defendant alleged that Llewellyn, in making the application for the bond, acted for and on behalf of the board of regents of said college, and at their instigation and by their direction; and that the surety, prior to the execution of the bond, made and caused due inquiry to be made of the said board of regents as to all facts within their knowledge touching any risk or liability which would be incurred by the defendant as such surety, and particularly as to any fact within their knowledge material to the said risk, and the said board of regents, acting by and through its president, and in response to such request for information and for the purpose of inducing the defendant to become surety upon the said bond, falsely and fraudulently stated and represented to the defendant ,among other things, that they had no knowledge or information of any circumstance which might unfavorably affect the risk of the surety on the bond applied for, and that the applicant's accounts on the date of such application were in every respect correct, and that he had property and funds on hand to balance his account. The answer further alleged that such statements and representations were false, and were known by said board of regents and the president thereof to be false, and were made for the purpose of inducing the defendant to become surety upon said bond. It was further alleged that the surety relied upon such representations, and the amended answer then proceeded to set up the facts as to the prior deposit by said secretary-treasurer of such funds in the First State Bank of Las Cruces, and alleged that said bank was insolvent at the date of the application for such bond, and that such facts were known to the board of regents.

The fifth paragraph of the answer set up a similar state of facts, and alleged that such facts were known to the Governor of the state of New Mexico, and that he failed to apprise the defendant thereof prior to its becoming surety upon such bond.

The sixth paragraph of the amended answer pleaded as a fifth defense that a large portion of the sum sued for, the exact amount of which was alleged to be unknown, but was stated upon information and belief to be more than $21,000, did not come into the hands of said Morgan O. Llewellyn after the execution of the alleged bond sued upon, but that said sum came into his hands prior to the execution of the bond, and was by him deposited in the First State Bank of Las Cruces long prior to the execution of said bond, and that said sum was and had been lost by said Llewellyn prior to the execution of the bond by defendant herein; that such money was lost by reason of the insolvency of the First State Bank & Trust Company, which was alleged to have been insolvent upon the date that the defendant executed the bond.

Paragraph 7 of the answer need not be set out, as no question is made as to the propriety of the action of the court in sustaining the demurrer thereto.

The eighth paragraph of the answer was as follows:

"And for further answer to said complaint, and without waiving any other defenses thereto, this defendant alleges that of the moneys claimed in this action, a large portion, the exact amount of which is to this defendant unknown, but defendant is informed and believes. to be an amount exceeding $21,656.76, were moneys derived from the sale of lands granted to the territory of New Mexico and confirmed by the Enabling Act of Congress approved June 20, 1910, to the state of New Mexico and by section 10 of said Enabling Act should have been kept in the custody of the state treas- ʼurer of the state of New Mexico, and were wrongfully in the hands of the said Morgan O. Llyellyn, and this defendant could not be held liable therefor on his said bond, even if said bond should be held valid and binding on this defendant as to funds rightfully coming into the hands of said Morgan O. Llewellyn as such secretary treasurer of said college."

The court sustained the demurrer filed by the state to paragraphs 2, 3, 4, 5, 7 and 8 of the amended answer, and overruled the same as to the sixth paragraph. To this paragraph of the answer plaintiff filed a reply, and the cause was heard as to the issue so made. Upon the trial as to this issue the appellant attempted to show by

the books of the bank at the time of the execution of
the bond set out in the complaint that there were de-
posited in the depository bank by the defendant Llewellyn
the sum of $53,711.17, that at that time the assets of the
bank were depleted to the extent of 37 2-3 per cent., and
that thereafter of the amount on deposit to the credit of
said Llewellyn as secretray-treasurer of the said institu-
tion there remained but 62 1-3 per cent. The state ob-
jected to this offered proof, and its objection was sus-
tained. Upon the evidence adduced the court found for
the state, and judgment was rendered for the full sum of
$75,000. From this judgment the present appeal is prose-
cuted, and five questions are presented for determination,
which may be stated as follows:

(1) Whether or not there are any statutes which ex-
pressly or impliedly require a bond to be given by the sec-
retary-treasurer of the board of regents of the New Mexico
College of Agriculture and Mechanic Arts.

(2) Whether or not in the absence of such a require-
ment of statute a bond such as was given by the secretary-
treasurer of the New Mexico College of Agriculture and
Mechanic Arts in this case is a valid and binding obliga-
tion.

(3). Whether or not misrepresentations upon the part.
of the agents of the state which may have been instru-
mental in inducing the said defendant surety company to
execute the said bond avoided the bond or released the
surety company from any liability thereunder.

(4) Whether or not the said defendant surety com-
pany would be liable for moneys coming into the hands of
said defendant Llewellyn as such secretary-treasurer which
said funds had been derived from the sale of state lands
under the provisions of section 10 of the Enabling Act,
providing for the admission of the territory of New Mexico
into the Union as a state.

(5) Whether or not there is sufficient showing upon
the part of the defendants that a portion of the funds for
which the defendant Llewellyn was liable as secretary-
treasurer of the said institution were lost prior to the time

of the execution of the bond, so as to relieve the defendant surety company from liability therefor.

The questions will be discussed in the order stated.

[**1, 2**] The solution of the first proposition depends upon the construction of the statute (chapter 138, Laws 1889; sections 3553, 3554, 3571, 3572, C. L. 1897). The New Mexico College of Agriculture and Mechanic Arts was established by said chapter 138, Laws 1889, by the legislative assembly of the territory of New Mexico. The same act established several other territorial institutions, among which was the University of New Mexico, located at Albuquerque. Sections 7 to 18 of said act provided for the establishment of the university and its control and management; section 9 of the act provided for the appointment of a board of regents; section 12 provided that the board should meet and organize by the election of its officers at Albuquerque at a specified time, and fixing the time for succeeding election, and further provided:

"At such elections they shall elect a president and a secretary and treasurer from their number. The person so elected as secretary and treasurer shall, before entering upon the discharge of his duties as such, execute a good and sufficient bond to the territory of New Mexico, with two or more sufficient sureties, residents of this territory, in the penal sum of not less than twenty thousand dollars, conditioned for the faithful performance of his duties as such secretary and treasurer, and that he will faithfully account for and pay over to the person or persons entitled thereto all moneys which shall come into his hands as such officer, which said bond shall be approved by the governor of the territory and shall be filed with the territorial secretary."

In the next section it is provided:

"The secretary and treasurer shall be the financial and recording officer of said board, shall keep a true and correct account of all moneys received and expended by him, shall attest all instruments required to be signed by the president, shall keep a true record of all the proceedings of said board, and generally do all other things required of him by said board."

Sections 19 to 27 of said act deal with the Agricultural College. Sections 20 and 21 read as follows:

"Sec. 20. The management of said college and experiment

station, the care and preservation of all property of which such institution shall become possessed, the erection and construction of all buildings necessary for the use of said college and station, and the disbursement and expenditure of all moneys provided for by this act, shall be vested in a board of five regents. Said five regents shall possess the same qualifications, shall be appointed in the same way, and the terms of (said) office shall be the same, and vacancies shall be filled in like manner as is provided in section 9 and section 10 of this act, with reference to the regents of the territorial university.

"Sec. 21. The board shall meet and organize by the election of its said officers, at said town of Las Cruces, or at the said college grounds in the said county of Dona Ana, on the second Wednesday of November, A. D. 1889. The officers then elected and their successors in office shall be the same, be elected in the same manner, at the same time, and possess the same qualifications, and the regents and officers shall perform their duties as provided for the regents and officers of the university of New Mexico in this act."

A secretary-treasurer, having been provided for the University of New Mexico, he was required to execute a good and sufficient bond in the penal sum of not less than $20,000 to the state, before entering upon the discharge of his duties. Under section 21 of said act, requiring the Agricultural College to have the same officers, who should be elected in the same manner, at the same time, and possess the same qualifications as the officers of the university, it is apparent that it was necessary for the secretary-treasurer of the Agricultural College to execute to the state a bond before entering upon the duties of his office. By reading sections 12 and 21 together we find that the qualifications of the officers of the college are the same as those for the university, and that one of the qualifications of the secretary-treasurer of the university is that he give a bond to the state, with two or more sufficient sureties, residents of the state, in the penal sum of not less than $20,000, conditioned, as is the case at bar, before entering upon the discharge of his duties as such officer. This being true, then it follows that before the secretary-treasurer of the Agricultural College would be qualified to enter upon the duties of his office he must execute such a bond. It is a rule of law, to which there is scarcely any exception, that where a statute provides

that when an officer is elected and holds office until his successor is elected and qualified, before the successor qualifies, he must give a bond in the event that a bond is required by statute. This holding of the courts is so universal that no authority is required to support it.

A consideration as to the meaning of the word "qualifications" as used in the section referred to, and as to what constitutes those qualifications as applied to the secretary-treasurer of the University of New Mexico, will demonstrate the soundness of this fact. The Century Dictionary defines "qualifications" as:

"The act of qualifying or the state of being qualified by change or modification. A quality adapting a person or thing to particular circumstances, uses, or ends. That which qualifies a person or renders him admissible to or acceptable for a place, an office, or an employment; any natural or acquired quality, property or' possession which secures a right to exercise any function, privilege, etc.; especially, legal power or ability; as the qualifications of an elector."

In the case of Hyde v. State, 52 Miss. 665, the word "qualifications," with reference to an office, was held to have a double meaning, one of which was the endowment or requirement which renders one eligible to a place or position, and the other one relating to the "act whereby one is installed in office." In the case of People ex rel. Bishop v. Palen, 74 Hun. 289, 26 N. Y. Supp. 225, the word "qualifications" was defined as "that which qualifies a person to render him admissible to or acceptable for a place, or an office or employment," and to qualify is held to mean "to make oath to any fact or to take oath of office before entering into its duties." Applying these definitions to the statute before us, it is clear that the qualifications of office as applied to the secretray-treasurer of the Agricultural College would include the giving of a bond as was required by the secretary-treasurer of the university. That this is a correct interpretation of the statute was recognized by this court in the case of Bowman Bank & Trust Co. v. First National Bank of Albuquerque, 18 N. M. 589, 139 Pac. 148. In that case in passing upon the contention that the secretary-treasurer had no

power to transfer a certificate of deposit from one depository to another, we said:

"Section 3574, C. L. 1897, provides: ''The person so elected as secretary and treasurer shall, before entering upon the discharge of his duties as such, execute a good and sufficient bond to the territory of New Mexico, with two or more sufficient sureties, residents of this territory, in the penal sum of not less than twenty thousand dollars, conditioned for the faithful performance of his duties as such secretary and treasurer, and that he will faithfully account for and pay over to the person or persons entitled thereto all moneys which shall come into his hands as such officer,' etc.

"In the absence of any direction from the board of regents, assuming for the sake of argument that the board had the power to direct and control the disposition, deposit, or investment of the funds in the hands of the treasurer, it could hardly be contended that it was not the duty of the treasurer to safely preserve and keep such funds. This being true, he could deposit such funds in any bank he saw fit, or keep them in his own possession, liable of course at all times under his bond 'to account for and pay over to the person or persons entitled thereto' such moneys. Suppose that he should in the absence of direction, deposit such funds in an insolvent bank and a loss should occur, would he not be liable nevertheless? Again, suppose he had distributed the funds among several banks, and he expected to be called upon by his successor, within the near future to turn over to him the moneys in his hands, would he not have the power to assemble the funds, to procure the actual cash, in order that he might turn it over to his successor? In the present case, May could have been in an anomalous situation, should appellant's contention be sound, if he had been required to account to his successor on the 5th day of July, and the incoming official had refused to accept as cash the certificate of deposit in question. The new treasurer had the right to demand that the actual cash should be turned over to him. Now, if May did not have the authority to withdraw the money from the First National Bank of Albuquerque, or to indorse the certificate of deposit, it would have been impossible for him to produce the money.

"The funds in question were placed in May's hands by the territorial officers. He took them under his official bond. He became absolutely responsible for these moneys, and so long as he accounted for the same and paid the money over to the person or persons entitled thereto, as provided in his bond, he could deposit the fund with any bank or banks he desired. Maloy v. Board of Commissioners of Bernalillo County, 10 N. M. 638, 62 Pac. 1106, 52 L. R. A. 126. In the absence of direction from the board, assuming its power to direct, May alone had the right to select a place to deposit."

There it was the view of the court that the provisions

of the statute relative to the university in this regard were applicable to the New Mexico College of Agriculture and Mechanic Arts.

From what has been stated it follows that the bond in question was a bond required by the law of the state of New Mexico; hence the demurrer to this paragraph of the answer was properly sustained. This being true, the second proposition stated is eliminated from the case.

[3] The third question, as stated by appellee, is: ·

"Whether or not misrepresentations upon the part of the agents of the state, which may have been instrumental in inducing the said defendant surety company to execute the said bond, avoided the bond or' released the surety company from any liability thereunder."

This proposition, thus stated, is probably subject to criticism, in that it impliedly assumes that the board of regents of the New Mexico College of Agriculture and Mechanic Arts was the agent for the state of New Mexico in the matter of securing the bond for its secretary-treasurer, and as such agent was authorized to represent the state in making the representations to the proposed surety as to the status of the funds and property in the hands of such secretary-treasurer. Said board of regents had no such duty cast upon it; hence was not authorized to act for or represent the state in such matter. The statute, as we have held, required the secretary-treasurer of that institution to execute such a bond in not less than the sum of $20,000, and provided for the approval of the bond by the Governor and its deposit with the secretary of state. The board of regents of such college had no duties whatever to perform in connection with the procuring of said bond. Its duties are defined by statute, and no such duty is imposed upon it. Hence it was not authorized to act for the state in the matter of making representations or statements to the proposed surety, and the state would not be bound by any act or statement on the part of the board of regents in this regard. The proposed surety had the right to act in this connection as it saw fit and proper in order to enable it to determine whether

or not it should become surety upon the proposed bond. It could have thoroughly investigated the accounts of the board. No officer of the state was authorized or required to make any representations whatever to the proposed surety. It was required to determine at its peril whether it would become surety to the state upon the proposed bond. It has been, we believe, universally held that the sureties of a public officer are not discharged by the laches or fraud of other officers of the state.

Appellant relies particularly upon the case of State v. Sooy, 38 N. J. Law, 324, 39 N. J. Law, 135. That case involved the question of liability upon the bond of the state treasurer. The allegation was that the Legislature of the state, with knowledge that Mr. Sooy had, as treasurer, wasted and embezzled the money of the state, averred and declared to the defendants in order to induce them to sign the obligation, that Sooy was a man of integrity and good business habits, and had so shown himself in all things in the performance of his duties as such treasurer. The court held that in this matter the Legislature was the agent of the state in the transaction embracing the reception of the bond, and said:

"If such agent, in the course of such business, perpetrated the fraud here alleged, there can be no question but that the instrument obtained by it was void."

But the court likewise in that opinion recognized the rule to which we adhere in this opinion. It said:

"I am strongly inclined to the opinion that the true rule of law is laid down in the case of Lee v. Monroe, 7 Cranch, 366, 3 L. Ed. 373, in which it is said that the government is not bound by the declarations of its agents unless it clearly appear that the agent was acting strictly within the scope of its authority. I do not think that the gratuitous information given by a public officer, or his acts or assertions, when not made in the discharge of his duty, can in any wise affect the legal rights of the state."

The defense in that case was sustained upon the theory that the Legislature, in making the representations alleged, was the agent of the state and acted within the scope and compass of its authority. No such question, however, is

presented in the case at bar, and if it be assumed that the decision relied upon is sound in principle, appellant is not benefited thereby, for his pleading does not show that the board of regents was the agent of the state in making the alleged representations, for it fails to point to any statutory authority so authorizing it in this regard. In Throop on Public Officers, § 286, the author says:

"The principle that the government, or its representative, the obligee, is not responsible for the negligence or other misconduct of other officers is well illustrated in the ruling that the sureties in a tax collector's bond cannot defeat a recovery upon the bond, by proof that the collector was a defaultler when he was appointed, and that the appointing officers knew that fact, but did not disclose it; and this, although the statute expressly forbids such an appointment; or the appointing board falsely represented that the accounts for the preceding term had been settled."

Bonds of the character now under consideration differ materially from bonds executed to private individuals. In the latter case, of course, such bonds are avoided by fraud or misrepresentations to the surety by the obligee, but the relation of the sureties towards the obligee in the bond of an officer holding by appointment or election under the authority of the sovereign power is peculiar and exceptional. In such a case the obligee in the bond is either the sovereign power itself or some municipal body exercising by statute a portion of the sovereign power . This circumstance materially modifies the rules of law relative to the rights of sureties in private contracts of suretyship. The sovereign power is charged with no duty or obligation to the proposed surety, and no officer or agent is authorized to represent the state or sovereign power in making representations to the proposed surety unless such power is conferred by statute or constitutional provision. The proposed surety in this case was charged with notice of the statute defining the powers and duties of the board of regents of this college. It knew, or should have known, that there was no statute which authorized the board of regents to represent the state and act as its agent in the matter of procuring the bond in question and making representations to it as to the state of account of the princi-

pal. In the case of State ex rel. Bell v. United States
Fidelity & Guarantee Co., 236 Mo. 352, 139 S. W. 163, it
was held that it was no defense for the surety on the bond
of the treasurer of a state institution that the treasurer
had been a defaulter during his terms just prior to the
execution of the bond, as a reasonable investigation would
have shown, and that the board of managers of the insti-
tution accepted his reports, and certified that his accounts
had been examined and approved by them, and that legis-
lative investigating committees had reported that they had
examined and approved his accounts, and that the surety
had known of and relied on such records and reports; 
the sureties of an officer not being discharged by laches
or fraud of other officers of the state.

And it is held by the Supreme Court of the United
States that the negligence of the officers of the United
States does not affect the liability of either the principal
or the surety in a bond of the United States. Minturn
v. U. S., 106 U. S. 437, 1 Sup. Ct. 402, 27 L. Ed. 208.

To the same effect see the following cases cited by ap-
pellee: Frost on the Law of Guaranty Insurance, §§ 163,
165; Bromberg v. Fidelity & Dep. Co. of Md., 139 Ala.
338, 36 South. 622; State v. U. S. Fidelity & Guaranty
Co., 236 Mo. 352, 139 S. W. 163; Aetna Indemnity Co.
v. City of Haverhill, 142 Fed. 124, 73 C. C. A. 342;
Fidelity & Dep. Co. of Md. v. Commonwealth, 104 Ky.
579, 47 S. W. 579, 49 S. W. 467; Independent School
Dist. v. Hubbard, 110 Iowa, 58, 81 N. W. 241, 80 Am.
St. Rep. 271; State of Fla. v. Rushing, 17 Fla. 226; State
v. Bates, 36 Vt. 387; Cawley v. People, 95 Ill. 249; State
of Kansas v. U. S. Fidelity & Guaranty Co., 81 Kan.
660, 106 Pac. 1040, 26 L. R. A. (N. S.) 865.

For the reasons stated we hold that the facts pleaded
in this paragraph of appellant's answer stated no defense.

[4-7] A more serious question is presented by the
fourth proposition stated, which involves several intricate
questions, the principal and paramount one being whether
or not the moneys derived from the sale of lands granted
or confirmed to the state of New Mexico by the Enabling
Act for agricultural and mechanical colleges constitutes a

permanent fund, the interest on which only can be used. This question is brought about by a provision in the Enabling Act which requires the state treasurer to keep all "such moneys" invested in safe, interest-bearing securities, and it is argued by appellant that moneys derived. from the sale of lands granted for the above purpose were made by Congress a permanent fund for the benefit of such colleges, and were required by said act to be kept by the state treasurer and by him invested; hence they were wrongfully in the hands of Morgan O. Llewellyn, and, being wrongfully in Llewellyn's hands, the surety upon his official bond did not undertake to answer therefor. A determination of this question might be avoided in this case for reasons later appearing in this opinion, but as the question is directly presented and is of the utmost importance to the state and for the protection of the officers thereof, we will proceed, to consider and dispose of it at this time.

Section 6 of the Enabling Act grants to the state four sections in each township for the support of the common schools; section 7 grants to the state, in lieu of grants made to other states for the purpose of internal improvements, certain other specified lands for various educational and other state institutions. The object of the grant and the amount of land for such purpose were specifically stated. It contains the following provision: "For agricultural and mechanical colleges, 150,000 acres."

In 1898, by Act Cong. June 21, 1898, c. 489, 30 Stat. at Large, 484, certain lands were granted to the territory of New Mexico by the United States government for specified purposes. Two sections in each township were given for the support of common schools; for the use of an agricultural college the territory was granted 100,000 acres, and it was provided that the proceeds of the sale of such lands should constitute a permanent fund, to be safely invested and the income thereof to be used exclusively for the purpose of such agricultural college. The section also included a grant to the university.

The first paragraph of section 10 of the Enabling Act reads as follows:

State v. Llewellyn et al., 23 N. M., 43.

"That it is hereby declared that all lands hereby granted, including those which, having been heretofore granted to the said territory, are hereby expressly transferred and confirmed to the said state, shall be by the said state held in trust, to be disposed of in whole or in part only in manner as herein provided and for the several objects specified in the respective granting and confirmatory provisions, and that the natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same."

The following paragraph reads as follows:

"Disposition of any of said lands, or of any money or thing of value directly or indirectly derived therefrom, for any object other than that for which such particular lands, or the lands from which such money or thing of value shall have been derived, were granted or confirmed, or in any manner contrary to the provisions of this act, shall be deemed a breach of trust."

The said section also contains the following provision:

"A separate fund shall be established for each of the several objects for which the said grants are hereby made or confirmed, and whenever any moneys shall be in any manner derived from any of said land the same shall be deposited by the state treasurer in the fund corresponding to the grant under which the particular land producing such moneys were by this act conveyed or confirmed. No moneys shall ever be taken from one fund for deposit in any other, or for any object other than that for which the land producing the same was granted or confirmed. The state treasurer shall keep all such moneys invested in safe interest-bearing securities, which securities shall be approved by the governor and secretary of state of said proposed state, and shall at all times be under a good and sufficient bond or bonds conditioned for the faithful performance of his duties in regard thereto as defined by this act and the laws of the state not in conflict herewith."

Appellant argues that by reason of the language found in the last provision quoted, "The state treasurer shall keep all such moneys invested in safe interest-bearing securities," etc., there is manifested a clear intention on the part of Congress to make all of the moneys derived from the sale of the lands granted by section 7 a permanent fund, the interest only being available for current use. We agree with this contention, except in so far as the grant is made to the state for "legislative, executive

and judicial public buildings heretofore erected in said territory, or to be hereafter erected in the proposed state, and for the payment of the bonds heretofore or hereafter issued therefor, 100,000 acres;" for the language here used in the granting act clearly shows that it was the intention of Congress that the proceeds of this land should be used for the erection of such buildings, or the payment of bonds heretofore or hereafter issued therefor. But the other grants in such section contain no language which will admit of such construction, and the direction by Congress contained in section 10, which requires the state treasurer to keep all such moneys invested in safe interest-bearing securities, clearly indicated the intention of Congress to create a permanent endowment fund for the various institutions for which the grants were made or confirmed. It would be impossible for the state treasurer to keep such moneys invested in safe interest-bearing securities if the institutions were permitted to expend the proceeds derived from the sale of lands from year to year at the option of its board of regents, or at the direction of the Legislature. The state treasurer is not directed to keep such balance of such funds as may remain in his hands from time to time invested, but "all" such funds. If the contention of appellee, to the effect that such grant of land was not intended to provide a permanent endowment fund for the various institutions, is the correct interpretation of the intent of Congress, then it would necessarily follow that the grant of lands made to the state for the support of the common schools was likewise not intended to create a permanent endowment fund for the common schools of the state; for, unless the lands granted for the benefit of the various institutions were designed to provide a permanent fund, it is likewise true that Congress intended that the state might use, from time to time, the proceeds of the moneys derived from the sale of lands granted to the state for the support of the common schools. A review of the attitude of Congress in this regard discloses that it has been the almost universal policy—to which we know of no exceptions—to provide an endowment fund for the common schools

of the various states, and in the Enabling Act of the states admitted in recent years, which we have examined, grants have been made to each of the several states of land for agricultural colleges and universities, and, without exceptions, the states have been required to hold the proceeds of the sale of such lands and invest the same and to use only the interest for the support of the colleges and universities named. As to the other state institutions, there have been no restrictions heretofore imposed upon the states in regard to the use of the proceeds derived from the sale of lands granted for such purposes; but it is apparent, we think, that Congress, in the case of New Mexico and Arizona, intended to go further in this regard than in the case of other states, and to make all such funds trust funds, the interest only of which could be used from year to year. That such was the intention of Congress, we think has been recognized by the Legislatures of both the states of Arizona and New Mexico. The Constitution of Arizona, article 10, accepts the grant of lands made by Congress according to the terms and conditions of the grant, and there is found in such article many of the provisions contained in the Enabling Act of that state, which, it might be remarked in passing, in this regard, are identical with the provisions of the Enabling Act for New Mexico. In 1915 the legislature of that state by chapter 5, Laws 1915, treated all the lands received under the Enabling Act in accordance with the interpretation which we have placed thereon. It is significant that the Legislature states in the beginning of the act. "for the purpose of complying with the provisions of section 7, article 10, of the Constitution of Arizona (which, as stated, is almost in the same language as the Enabling Act) and of the disposing of all moneys derived from the lands granted or confirmed to this state by the Enabling Act."

The Legislature of New Mexico at its last session (chapter 115, Laws 1917) likewise treats the funds derived from the sale of lands granted the state for the various state institutions as permanent funds, and directs the

treasurer to place all moneys derived from the sale of lands into special funds and to invest the same.

It is evident that the Enabling Act as it first passed the House of Representatives (see Cong. Record, 45, pt. 1, p. 702) contained provisions which made only the proceeds of lands granted to the state for common school purposes and for the agricultural college and state university permanent funds. The bill was amended by the Senate in its present form and became a law by reason of the concurrence of the House in the Senate amendsigned to make the proceeds of all these lands granted ments. The amendment in this regard, we think, was defor the various purposes( except for legislative, executive, and judicial buildings, as stated, and another exception is to be noted in the grant of land for the purpose of paying the indebtedness of Santa 'Fé and Grant counties for railroad aid bonds) permanent funds, the interest only of which could be used.

The Senate Committee Report (Report No. 454, Sixty-First Congress) states (quoting from page 18 of the printed report) :

"The Senate Bill (sections 10 and 28) expressly declares that the lands granted and confirmed to the new state shall he held in trust, to be disposed of only as therein provided and for the several objects specified. The same trust feature is extended to the proceeds of the granted lands."

And further it is later stated:

"As hereinabove indicated it extends the trust attaching to the lands to the funds created by their disposition and requires that each fund be kept separate by the state treasurer and that he be under bond for' their safe-keeping."

On page 20 of the Senate Committee Report we find the following:

"Your committee inserts in this report the testimony of witnesses appearing before it with reference to the safeguards thrown about the disposition of public lands granted in this bill."

From the testimony of Hon. L. B. Prince, Ex-Governor of New Mexico, (Page 5 of the hearings) is taken the following:

"The Chairman: Before you get to the bond question let me ask you this. I understood you to say in private conversation that you highly approved, as you said every other man did who thought of the subject, of the safeguards thrown about the disposition of public lands granted in this bill.

"Mr. Prince: We approve of the strictest safeguards that can possibly be found in order to insure the perpetuity of this fund and its inviolability."

It is evident that the above excerpt from the testimony of former Governor Prince was inserted in the committee report for the purpose of justifying the action of the committee in making the proceeds of the sale of these lands permanent funds. It further shows the understanding of the members of the committee as to the meaning of the language they had employed in the amended bill. Again, reference is made in the committee report of certain provisions of the Enabling Act for Oklahoma, by which the proceeds of the sale of certain lands, and a grant of $5,000,-000 by Congress to that state for common school purposes, are made permanent funds. This argument was evidently advanced by the committee for the purpose of justifying its action in making the proceeds of the sale of the granted lands permanent funds.

When the amended resolution was passed by the Senate and the House, those bodies had before them the report of the committee, which prepared the amended bill and must be presumed to have intended it to have the effect and accomplish the ends sought by the committee.

It is argued by the Attorney General's office that such a construction will preclude the state from using the rentals derived from the lands in question. This argument is based upon the assumption that the language of section 10, "whenever any moneys shall be in any manner derived from any of said lands the same shall be deposited by the state treasurer in the fund corresponding to the grant under which the particular land producing such moneys were by this act conveyed or confirmed," and the direction that "the state treasurer shall keep all such moneys invested in safe interest-bearing securities," compels such construction; that the rentals derived from these lands were placed in the same status as moneys derived from

sales, and would be likewise required to be invested by
the state treasurer and would be subject to the same trust
as though it were derived from the sale of the land.   We
do not think the language of the Enabling Act forces such
a construction, and certainly it should not be given the
language unless it is plainly required.   It is not required
by reason of the fact that it is the duty of the state treas-
urer to create a separate fund for each of these various
objects and to place all moneys derived from any such
lands in such fund.   This language simply requires the
state treasurer to keep a separate fund for each of the
various objects for which lands were granted; for example,
lands were granted the state for a state university, like-
wise for the common schools of the state.   The treasurer
is required to have a separate fund for money derived from
grants for the state university into which fund he is re-
quired to deposit all proceeds derived in any manner
from any of such lands, whether it be from the sale or
rental thereof.   He is not prohibited from keeping separate
items in such fund showing moneys derived from the sale
of lands and money derived from rentals or otherwise ac-
quired from such lands; nor is there anything contained
in the language found in the first paragraph of section
10, which provides "that the natural products and money
proceeds of any of such lands shall be subject to the same
trusts as the lands producing the same," which alters the
determination that it was the intention of Congress that
the state should use the moneys derived from the rentals
of the land for the current support of the schools and
institutions.   By the language above quoted it was pro-
vided that the natural products and money proceeds of
any of said lands should be subject to the same trusts
as the lands producing the same, namely, for the support
of the institutions for which the grant was made, and
the use of the rentals derived from the land is not a diver-
sion of the money from the trust created.   If appellant's
contention in this regard be sound it could with equal
propriety be argued that the interest derived from the
moneys invested by the state treasurer likewise could not
be expended by the state, which would result in the con-

stant increase of the fund, and the grant made would be futile and the act of Congress absurd.

"Statutes will be construed in the most beneficial way which their language will permit to prevent absurdity, hardship, or injustice; to favor public convenience, and to oppose all prejudice to public interests." Sutherland on Statutory Construction, p. 913.

In construing an act of the General Assembly, such a construction will be placed upon it as will tend to advance the beneficial purposes manifestly within the contemplation of the General Assembly at the time of its passage; and courts will hesitate to place such a construction upon its terms as will lead to manifestly absurd consequences, and impute to the General Assembly total ignorance of the subject with which it undertook to deal. Sutherland on Statutory Construction, § 490.

The requirement that the state treasurer shall keep all such moneys invested, etc., was directed, we think, to the moneys derived from the sale of the lands granted to the state or to the natural products thereof, such as coal, timber, stone, etc., and that it has no application to moneys derived from the rental of these lands. Suppose, for example, that the state should determine that it was more advantageous to the schools and various institutions that such lands should not be sold, but that they should be retained and rented. If appellee's argument be sound, it the proceeds for the purpose for which the trust was crewould not be possible for the state to do this and to use ated. We think the object sought to be accomplishesd by Congress justifies the construction which we have placed upon the Enabling Act in this regard. It is a primary principle in the construction of statutes that an adherence to the letter must be abandoned if by such adherence the leading or primary object of the Legislature is to be defeated.

"Word and clauses in different parts of a statute must be read in a sense which harmonizes with the subject-matter and general purpose of the statute. No clearer statement has been or can be made of the law as to the dominating influence of the intention of a statute in the construction of all its parts than that which is found in Kent's Commentaries:

'In the exposition of a statute the intention of the lawmaker will prevail over the literal sense of the terms; and its reason and intention will prevail over the strict letter. When the words are not explicit, the intention is to be collected from the context, from the occasion and necessity of the law; from the mischief felt, and the remedy in view; and the intention is to be taken or presumed according to what is consonant with reason and good discretion. If upon examination the general meaning and object of the statute be found inconsistent with the literal import of any particular clause or section, such clause or section must, if possible, be construed according to that purpose." Sutherland on Stat. Const., § 370.

See, also, State ex rel. Lorenzino v. County Commissioners, 20 N. M. 67, 145 Pac. 1083, L. R. A. 1915C, 898.

"The general terms of a statute are subject to implied exceptions founded on the rules of public policy, and the maxims of natural justice, so as to avoid absurd and unjust consequences." Lewis' Sutherland Stat. Const. § 385.

In the grants made to this state by Congress it limited the price at which the lands granted might be sold, and the Enabling Act contained provisions for the leasing of the lands. At the arbitrary minimum price for which the lands may be sold, many years might elapse before the schools and institutions would receive any benefit from the grants so made. In prior grants, made for like purposes by Congress to other states, it has always been proper for the states to use the rental moneys, from year to year, for the maintenance and support of the institutions for which the grants were made. And, as stated, the absurd consequences which would flow from such a construction relative to the rentals derived from these lands compel an exception to the general language found in the Enabling Act.

Our construction in this regard is strengthened by another consideration. The Legislatures of both New Mexico and Arizona have treated the rentals of the lands granted and confirmed by the Enabling Act as current funds to be used for the support of the school and institutions for which the grants were made. Both states have provided for the use thereof annually for such purposes. The Enabling Acts contain provisions giving to the Attorney General of the United States the right, by proceed-

ings in the federal courts, to restrain any misapplication of such funds, or the diversion thereof from the trust created. No action in this regard has been instituted against either state, evidently because the law officers of the United States do not regard either act as a breach of trust

[8] The state treasurer being the proper custodian of this fund, we will proceed to examine the answer filed by the appellant and determine whether or not it stated a good defense to the action of the state on the bond in this regard. It alleged that an amount exceeding $21,656.76 was money derived from the sale of lands granted to the territory of New Mexico and confirmed by the Enabling Act of Congress, etc., and that by section 10 of said Enabling Act such moneys should have been kept in the custody of the state treasurer of the state of New Mexico and were wrongfully in the hands of said Morgan O. Llewellyn, etc. This paragraph of the answer is set out in full in the statement of facts, and need not be repeated here. It is framed upon the assumption evidently that a surety upon an official bond, in this state, is answerable only for defaults of the principal where he acts *virtute officii,* and for those acts done under color of office (*colore officii*) merely no liability attaches. The answer does not undertake to deny that the money in question came into the hands of the principal *colore officii,* but the defense is grounded upon the fact that under the law some other official was the legal custodian of the fund.

The answer does not undertake to show whether the moneys in question were paid to the principal by the state treasurer after the Enabling Act became effective, or whether it was passed to him by the retiring secretary-treasurer who received it before statehood, at which time there was no restriction or provision relative to the custody of the funds derived from the sale of the lands granted the territory for the benefit of the Agricultural Colleges.

Of course, if the money was paid to Llewellyn as an individual and not as secretary-treasurer, in his official capacity, there would be no question as to the non-liability of the surety. The complaint alleged that the

principal, at the time of the default, had in his hands, as such secretary-treasurer, the sum of $76,413.52, which, of course, included the $21,656.76 in question. We will therefore assume, because not denied, that the money was received by the principal, in his official capacity, and, although received without authority of law, but by color of his office, determine the question as to the liability of the surety to answer therefor.

In an extensive note to the case of Fellar v. Gates, 91 Am. St. Rep. 492, Judge Freeman, on page 510, discusses the question very ably and exhaustively. He says:

"In applying the rule that sureties on official bonds are responsible for breaches by the principal obligor of official duties only, many of the courts have recognized and sought to apply a distinction between acts done by the principal by virtue of his office (virtute offici) and those done under color of office (colore offici) merely. As commonly put, those acts are virtute officii which 'are within the authority of the officer, but in doing which he exercises that authority improperly, or abuses the confidence which the law reposes in him; whilst acts done colore officii are where they are of such a nature that the office gives him no authority to do them.' For the former, the sureties are said to be liable, while as to their liability for acts of the principal done colore officii the authorities are in conflict. The distinction suggested has been productve of anything but harmony among the authorities, and in its attempted application to particular cases it has served to confuse rather than to clarify. It is a distinction hard to make in theory, and even more difficult to apply in practice. Not only do the courts differ as to the liability of the sureties for acts colore officii, but among those authorities which agree that such acts are covered by the obligation of the bond the most widely divergent views are entertained as to what constitutes acts 'colore officii' within the meaning of the definition. While, therefore, the cases are full of discussions concerning the distinction between acts done by virtue and those done under color of office, the distinction is 'of little practicable application.' "

"The author of the note further says: "On the other hand, the preponderance of authority holds the sureties on an official bond liable where acts were done *colore officii*," citing in support of the rule announced quite a number of cases. While most of these cases involved acts of marshals, constables, and sheriffs in levying attachments and executions, still we cannot see why the same rule would not apply to the present case.

The case of State ex rel.Hall, Trustee, v. McGill. 15 Ind. App. 289, 43 N. E. 1016, affords direct authority for the application of the rule to this case. In that case money was paid to the county clerk by one seeking to redeem land sold at a tax sale. The clerk was not authorized to receive the money. The court said:

"The act of the clerk, in receiving the money, was one done, not by virtue of his office, for there was no law authorizing it; but it was one done by color of his office. He assumed to and did the act as the clerk. The authorities are all agreed that, for an act done by virtue of the office, the officer must answer upon his bond. But, when an act is done by color of office, the decisions are not in harmony. The weight of authority seems to be that, for an act done by color of office, the officer must answer upon his bond. See Mechem, Public Officers, sections 282, 283 and 284, and cases cited in notes. Commonwealth v. Cole, 7 B. Mon. 250, 46 Am. Dec. 506, and note. And this seems to be the trend of the more recent decisions in this state. Henry v. State ex rel., 98 Ind. 381; State ex rel. v. White, 88 Ind. 587 (593); State ex rel. v. Walford, 11 Ind. App. 392 [39 N. E. 162]."

And the Supreme Court of the United States is in accord with the view that the sureties are liable for acts done by their principal *colore officii*, as is shown by the case of Lammon v. Feusier, 111 U. S. 17, 4 Sup. Ct. 286, 28 L. Ed. 337.

The Supreme Court of Michigan, in the case of County of Cheboygan v. Erratt, 110 Mich. 156, 67 N. W. 1117, in discussing the question as to the liability of the sureties on the bond of the treasurer for money derived from the sale of bonds, which the county had no authority to issue, said:

"Can it be said that, because the board of supervisors exceeded its power in authorizing the borrowing of this money, the money did not come into the hands of the defendant Erratt as treasurer? We think not. In Berrien County Treasurer v. Bunbury, 45 Mich. 79, 7 N. W. 704, the action was on the official bond of Bunbury as treasurer of the city of Niles. It was contended that the tax rolls of the Second and Third wards were invalid for want of a warrant, and that, as to the money collected on such rolls, the sureties were not ilable. The court said: 'The suit is not founded on any default. in making collection. Neither is it an action against delinquent taxpayers. Its object is to recover from the officer and his sureties, for the benefit of the state and county, the very money which he, as treasurer, actually

received for them, and wholly fails and refuses to account for and pay over. The money went into his hands. He received it in payment of taxes and as money belonging to the public. Whose money is it? * * * * It was not his when it was paid and received, and has not become his since. It belongs to the state and county. * * * Whether it went into Bunbury's keeping by the right hand or the left, on papers regular or irregular, with or without a warrant, makes no difference. Its ownership in equity and his legal responsibility were the same.' In the present case, as in Bunbury's, the owners of the money were ready to part with it to the county on the security given. Whatever the nature of the obligation incurred by the county, the money became the money of the county, and was received by the treasurer as such, and received into the treasury of the county. It came into his hands as treasurer. As was said by Mr. Justice Cooley in Marquette Co. v. Ward, 50 Mich. 177, 15 N. W. 70, speaking of a bond of like condition: 'In its terms it could not well be more general. Moneys received officially from any source whatsoever are apparently within them.' "

The rule exempting sureties from liability, for acts *colore officii,* was doubtless adopted by many of the courts before the advent of surety companies, whose business it is, for a stipulated compensation, to guarantee the fidelity of officers and employes. The obligation of sureties was then ordinarily assumed without pecuniary compensation, and was not extended by implication or construction. Their liability was *strictissimi juris.* In this state no definite rule on the subject has been established by the courts, and we see no good reason for a departure from the apparent majority rule that the surety is liable for the acts of the principal *colore officii.* We believe the public interests will be more surely protected and safeguarded by the establishment of such rule here.

In the present case Llewellyn received the money in question because he was secretary-treasurer of the institution, and as such he was undertaking to keep and preserve it. It was lost by the failure of the bank in which it was deposited, and if the surety can escape liability, the state must either lose the money or recover it from some other source. Llewellyn lost the money which belonged to the state, or to the institution of which he was secretary-treasurer, and by the terms of the bond the surety undertook:

"If the said Morgan O. Llewellyn shall faithfully perform his duties as secretary and treasurer of the New Mexico College of Agriculture and Mechanic Arts, and faithfully account for and pay over to the person or persons entitled thereto all moneys which shall come into his hands as such officer, then this obligation to be null and void; otherwise to remain in full force and effect."

Thus, by the terms of the undertaking it will be seen that the surety undertook that Llewellyn would account for all moneys which came into his hands as such officer, and, as the answer fails to show that the moneys in question did not come into his hands "as such officer," it was subject to demurrer, although alleging that it was wrongfully paid to him, in that some other officer was the legal custodian thereof.

From what has been said it follows that the court properly sustained the demurrer to this paragraph of the answer.

[9] The solution of the fifth proposition depends upon whether or not the trial court properly excluded evidence offered by the appellant as to the financial condition of the depository bank at the time of the execution of the bond in question. This bank failed some ten months after the bond herein was executed. At the time of the execution of the bond, and subsequent thereto until the failure of the bank, it acted as a depository of the funds in the hands of Morgon O. Llewellyn, secretary-treasurer of the aforesaid college. The bank was selected as depository by Llewellyn, there being no law regulating such matters. The state offered evidence to show that at the time of the execution of the bond Llewellyn had in his hands the full amount stated in the complaint. The evidence consisted of certificates of deposits issued by the depository bank to the said Llewellyn. The appellant proposed to show that at the time of the execution of the bond herein the assets of the bank were impaired to the extent of 27 2-3 per cent. While the face value of the assets of the bank exceeded its liabilities, as shown by its books, it proposed to show that some of the assets were without value. This proof was rejected by the court, which appellant claims was error. The state contends that it was immaterial to

the issues in the case as to what the books of said bank showed concerning the money to the credit of Llewellyn, as treasurer of said college. Further, that the tendered testimony was objectionable, in that it is not a correct statement of the law that the bank was insolvent and unable to pay its obligations on March 9, 1914, the date of the execution of the bond, in view of the fact that it had been agreed that the bank continued doing business, receiving and paying out money for about ten months after the date named.

The tendered testimony was insufficient, in that there was nothing to show that the said total sum of $76,413.52 could not have been paid by the said bank to the said Llewellyn upon demand made therefor; further, said tendered testimony was insufficient, in that the condition of the bank on the 7th day of March, 1914, as was attempted to be shown by the tendered testimony, would in no particular prove or tend to prove that the sum of money as claimed by appellant, or any part thereof, was lost prior to the time of the execution of the bond sued upon in this case. In order for testimony of this character to have been material and relevant, it would have been necessary for appellant to have made a showing that at all times, from the time of the execution of the bond up to the time of the execution of the bond up to the time of the demand made upon the defendant Llewellyn by his successor, there was not sufficient funds in the bank to have paid the amount to the credit of the defendant Llewellyn, and that any demand for the payment of said sum would not have been complied with. Notwithstanding the fact that the assets of the bank might have been impaired at the time of the execution of the bond, still, as it continued in business for more than ten months thereafter, during that interim its assets might have been replenished by assessments upon its stockholders or otherwise, so that it would have been able to pay to the secretary-treasurer the full amount of the deposit For this reason the court properly rejected the tendered proof.

For the foregoing reasons, the judgment of the trial court will be affirmed; and it is so ordered.

HANNA, J., and PARKER, J., concur.

[Rehearing Denied September 10, 1917.]